**Kasowitz LLP**
Daniel A. Saunders (SBN 161051)
DSaunders@kasowitz.com
1801 Century Park East, Suite 2400
Los Angeles, California 90067
Telephone:   (424) 288-7900
Facsimile:   (424) 288-7901

Dwayne A. Amos (*pro hac vice* application forthcoming)
DAmos@kasowitz.com
1633 Broadway
New York, NY 10019
Telephone:   (212) 506-1912
Facsimile:   (212) 506-3599

*Attorneys for Plaintiff Eric Ryder*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIC RYDER, an individual, | Case No.: |
| Plaintiff, | **COMPLAINT FOR:** |
| v. | **1. Copyright Infringement** |
| JAMES CAMERON, an individual; LIGHTSTORM ENTERTAINMENT, INC., a California corporation; 20th CENTURY STUDIOS, INC., a California corporation; THE WALT DISNEY COMPANY, a Delaware corporation; BUENA VISTA HOME ENTERTAINMENT, INC. d/b/a WALT DISNEY STUDIOS HOME ENTERTAINMENT, a California corporation; DISNEY STREAMING SERVICES, LLC, a California limited liability company; and DOES 1 through 10, inclusive, | **2. Breach of Contract**<br>**3. Breach of Confidence**<br>**4. Unfair Competition**<br><br>**JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Eric Ryder ("Ryder"), for his Complaint against Defendants James Cameron ("Cameron"), Lightstorm Entertainment, Inc. ("Lightstorm"), 20th Century Studios, Inc. ("20th Century Studios"), The Walt Disney Company ("TWDC"), Buena Vista Home Entertainment, Inc. d/b/a Walt Disney Studios Home Entertainment ("Disney Home Entertainment"), Disney Streaming Services, LLC ("Disney Plus," and together with TWDC and Disney Home Entertainment, "Disney"), and Does 1-10 (collectively with Cameron, Lightstorm, 20th Century Studios, and Disney, "Defendants"), alleges as follows:

## **PRELIMINARY STATEMENT**

1.     After failing in their efforts to lawfully acquire Ryder's intellectual property, Cameron and Lightstorm decided to take it anyway.

2.     This action arises from Defendants' knowing and unauthorized exploitation of Ryder's original and confidential creative work in the development and release of a major motion-picture sequel, after Defendants had full knowledge of Ryder's ownership, prior infringement claims, and refusal to sell or license the rights to his creative work.  Having once succeeded in escaping liability, Cameron and Lightstorm chose not to reform their conduct, but instead to double down and escalate their deliberate and blatant copyright infringement.

3.     Ryder owns valid copyrights in original motion-picture materials and related work product titled *KRZ* featuring distinctive narrative structure, themes, plot devices, characters, and story progression.

4.     Defendants Cameron and Lightstorm, along with distributor Twentieth Century Fox Film Corporation ("Twentieth Century Fox"), previously released a feature film titled *Avatar* that Ryder alleged infringed on his rights in *KRZ*.  That dispute led to a litigation that concluded in Cameron and Lightstorm's favor upon findings that (i) Cameron independently created a hybrid script/treatment for *Avatar* (the "Scriptment") before having access to Ryder's work, and (ii) any similarities between *KRZ* and *Avatar* beyond those in the preexisting Scriptment were

Kasowitz LLP
Attorneys at Law
Los Angeles

2

insufficient to establish substantial similarity.

5.     After the resolution of that litigation, Cameron and Lightstorm affirmatively sought to acquire Ryder's underlying intellectual property rights in *KRZ*. Ryder declined to sell. Cameron and Lightstorm then attempted to have a court force Ryder to sell the rights, but Ryder successfully defended against that attempt.

6.     Cameron and Lightstorm proceeded to appropriate Ryder's protected expression anyway, this time blatantly incorporating it into the sequel to the very film that had been the subject of the first action—*Avatar: The Way of Water* ("*Avatar 2*").

7.     *Avatar 2* was written, directed, produced, and/or distributed by Defendants Cameron, Lightstorm, 20th Century Studios, and Disney.

8.     *Avatar 2* does not merely echo Ryder's ideas at a high level of abstraction. It reproduces Ryder's express creative work at the level of character architecture, plot sequencing, dramatic gimmicks, thematic construction, and dramatic resolution—expressive elements that are newly copied, plainly protectable, and entirely absent from Cameron's asserted preexisting materials.

9.     Unlike with the first film, Cameron can no longer plausibly claim independent creation. The similarities in the sequel are not limited to generalized concepts, scènes à faire, or genre conventions. They reflect verbatim and structural appropriation of Ryder's original expressive choices, and they appear for the first time only after Defendants had full access to Ryder's copyrighted and confidential submissions.

10.     Most notably, *Avatar 2* introduces as a central plot device an animal-based substance that when harvested extends human life—the very same unique and highly specific narrative mechanism that Ryder conceived and confidentially disclosed years earlier in Ryder's *KRZ* works. This device did not appear in Cameron's prior work or any preexisting materials and has no independent origin in Defendants' documented development history. Its appearance for the first time only after Defendants had full access to Ryder's proprietary work exemplifies the

deliberate and unauthorized appropriation alleged in this action. While this animal-based, life-extending substance is just one of many examples of infringing content in *Avatar 2,* its use as a foundational plot device is central to Defendants' appropriation.

11.    *Avatar 2* therefore constitutes an unauthorized derivative work created with actual knowledge of Ryder's rights and prior claims of ownership.

12.    Defendants' misconduct was not limited to copyright infringement. Cameron and Lightstorm obtained access to Ryder's detailed creative material under circumstances that imposed contractual duties as well as a duty of confidence. Cameron and Lightstorm then misused Ryder's confidential submissions for a commercial purpose wholly outside the scope of any authorized evaluation or venture, and without compensating Ryder for said use, in breach of those duties.

13.    Defendants' conduct also constitutes unlawful and unfair business practices under California Business and Professions Code § 17200. By misappropriating Ryder's protected and confidential material rather than licensing it, Defendants obtained an improper competitive advantage, distorted the marketplace for independent creators, and avoided the very costs that lawful participants in the industry routinely incur.

14.    This action is not an attempt to relitigate prior claims. It challenges new acts of copying that occur for the first time in *Avatar 2*, post-date the earlier litigation, and rest on substantially different infringing conduct, different expressive content, and emphatically stronger evidence of willfulness.

15.    Ryder seeks injunctive relief prohibiting further exploitation of *Avatar 2* and future franchise installments,[1] actual and consequential damages, disgorgement of Defendants' profits, restitution under California's Unfair Competition Law, punitive damages, and all other relief necessary to prevent Defendants from

---

[1] The next sequel, *Avatar: Fire and Ash*, will be released in the United States on December 19, 2025. On information and belief, two more sequels are currently filming or in development.

continuing to profit from the unauthorized use of Ryder's creative work.

## JURISDICTION AND VENUE

16.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338(a), and 1367(a) because the Court has original jurisdiction over Ryder's claim for copyright infringement and supplemental jurisdiction over Ryder's claims arising under California law.

17.    The Court has personal jurisdiction over Defendants because they reside and/or conduct business in the State of California.

18.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because all Defendants reside in this district and a substantial part of the events and omissions giving rise to Ryder's claims occurred in this district.  Venue also is proper in this district pursuant to 28 U.S.C. §§ 1391(c) and 1400(a) because all Defendants are subject to personal jurisdiction in this district and reside in this district.

## PARTIES

19.    Plaintiff Eric Ryder is an individual residing in Ojai, Ventura County, California.

20.    Ryder is informed and believes, and on that basis alleges, that Defendant Cameron is an individual who resides in Los Angeles County, California.  Cameron is the sole shareholder and Chief Executive Officer of Defendant Lightstorm and has held that position at all relevant times.

21.    Ryder is informed and believes, and on that basis alleges, that Defendant Lightstorm is a California corporation with its headquarters located in Santa Monica, California.

22.    Ryder is informed and believes, and on that basis alleges, that Defendant 20th Century Studios is a California corporation with its headquarters located in Los Angeles, California.  20th Century Studios is a subsidiary of TWDC and became successor to Twentieth Century Fox through Disney's acquisition of same; as such, unless indicated otherwise, all references to 20th Century Studios and Twentieth

KASOWITZ LLP
ATTORNEYS AT LAW
LOS ANGELES

Century Fox herein shall include the other as applicable based on the timeframe of the particular allegation.

23.    Ryder is informed and believes, and on that basis alleges, that Defendant TWDC is a Delaware corporation with its headquarters in Burbank, California. TWDC acquired 21st Century Fox, Inc. and its subsidiary Twentieth Century Fox, the predecessor to Defendant 20th Century Studios, in or around 2019 and thereby indirectly owns the rights to the *Avatar* franchise through its ownership of 20th Century Studios.

24.    Ryder is informed and believes, and on that basis alleges, that Defendant Disney Home Entertainment is a California corporation with its principal place of business in Burbank, California.

25.    Ryder is informed and believes, and on that basis alleges, that Defendant Disney Plus is a Delaware corporation with its headquarters in Burbank, California. Disney Plus currently stores and distributes the *Avatar* films via its online streaming platform.

26.    The true names and capacities of Does 1 through 10, inclusive, are presently unknown by Ryder, who therefore sues said defendants by such fictitious names.  Ryder is informed and believes, and on that basis alleges, that each of the fictitiously named defendants has liability for one or more of the claims asserted or to be asserted in this action.  Either their identities are not yet known to Ryder or the facts concerning their liability and/or their amenability or capacity to be joined as defendants in this case are not yet sufficiently known to Ryder to allow their joinder in this pleading.  As additional facts concerning such matters are learned, Ryder will move promptly to amend this Complaint accordingly.

27.    Defendants are, and at all material times have been, the agents and servants of, and acted in concert with, one another with respect to the acts and conduct herein alleged, and are responsible for and liable to Ryder for the damages arising out of such conduct.

KASOWITZ LLP
ATTORNEYS AT LAW
LOS ANGELES

COMPLAINT

**FACTUAL BACKGROUND**

I.  **RYDER AND LIGHTSTORM'S AGREEMENT TO DEVELOP THE *KRZ* PROJECT**

28.    In the late 1990s, Ryder was regarded as a top 3-D artist and designer with an extensive background in the CGI business.  He was a partner at the computer animation boutique Bionic Research Development and had deep experience in media and animation, including over a decade of practice in 3-D and computer-driven media animating characters and scenes for production and design companies around the United States.

29.    From in or around 1996 to 1998, Ryder wrote an environmentally themed science-fiction story titled *KRZ 2068*—subsequently shortened to *KRZ*—set in the distant future, involving anthropomorphic beings, a vast oceanic setting, and a sinister, Earth-based corporation engaging in environmentally harmful mining operations on the moon of a gas giant planet called Europa (the "*KRZ* Story").

30.    Ryder developed the *KRZ* Story independently, including by leveraging his technical background and experience to design and build the science fiction characters, writing the narrative story, creating and animating a trailer, and developing an ahead-of-its-time internet distribution plan—*i.e.,* what would be referred to in today's vernacular as "streaming."

31.    In 1998, Ryder, with the assistance of his wife, prepared a detailed written business proposal containing, among other things, the *KRZ* Story and terms for a proposed joint venture to commercially exploit the *KRZ* Story ideas (the "*KRZ* Proposal").  In the *KRZ* Proposal, Ryder and his wife refer to themselves in their individual capacities as well as through their d/b/a "Channel Modus."

32.    The *KRZ* Proposal "outlines Channel Modus's proposal to produce *K.R.Z.*" and states terms for a joint venture by which Channel Modus and a movie studio or production company would jointly develop a motion picture and commercially exploit an entertainment franchise relating to the *KRZ* Story.  The

Proposal also contains the following "Notice to Recipients":

> By your receipt of this document, you agree that (i) this Proposal and its contents are confidential; (ii) neither you, nor any person or entity with which you are associated, nor any of their or respective agents, representatives or employees will copy, reproduce, or distribute to others this Proposal, in whole or in part, at any time without the prior written consent of Channel Modus; (iii) you and they will keep permanently confidential all information contained herein not already in the public domain; and (iv) you and they will use this Proposal for the sole purpose for which it is intended and not in any manner detrimental to the interests of Channel Modus or the respective partners, advisors, or retainees.
>
> . . .
>
> If you have not already done so, please immediately confirm the receipt of this Proposal and your agreement to the confidentiality and other terms as outlined herein. In the event you do not intend to be bound by these terms, you agree to immediately return the Proposal without delay. . . . Otherwise, you and your associates, representatives and agents, shall be deemed bound by the terms herein.

33.    In February 1999, Ryder sent a Velo-bound, tamperproof sealed copy of the *KRZ* Proposal to his father-in-law's former college acquaintance, Andrew Wald.  Wald was an independent film producer at the time and had formerly served as the President of Worldwide Pay Television for Twentieth Century Fox from 1979 to 1986.

34.    Wald expressed interest after reading the *KRZ* Proposal, and Wald and Ryder met in Los Angeles to discuss the *KRZ* Proposal in or around March 1999 and again in November 1999.

35.    In or around the first quarter of 2000, Wald called Jay Sanders, who was at that time the Director of Development at Lightstorm, to tell Sanders about the *KRZ* Story.  Wald, who had extensive experience in major motion picture acquisition and development, had a working relationship with Sanders dating back to at least 1997. Wald knew that Sanders liked science fiction and thought that Sanders would be interested in *KRZ*, so he sent him the *KRZ* Story.

36.    As Director of Development at Lightstorm, Sanders developed motion picture and television properties for Cameron under Cameron's overall deal with Twentieth Century Fox.  Sanders was responsible for acquiring projects for Lightstorm, including by sourcing material that Lightstorm—and specifically Cameron—might be interested in developing.  Although there were no written criteria for prospective materials, Sanders understood that Cameron, who was an avid diver with an interest in science fiction, was mainly interested in projects involving science fiction and anything involving a water element.

37.    Sanders was highly interested in *KRZ*.  He read the *KRZ* Story within days of receiving it from Wald in early 2000, and then told Lightstorm executives at Lightstorm's next Development Department weekly meeting that he really liked the project.

38.    In or around January or February 2000, Wald advised Ryder that Lightstorm was interested in the *KRZ* Story, and in or around February 2000, Ryder, Wald, and Wald's associate, Toni Baffo, met with Sanders at Lightstorm's corporate offices in Santa Monica (the "Initial Meeting").

39.    At the Initial Meeting, Sanders provided suggestions as to how to turn the *KRZ* Story into a feature-length motion picture and told Ryder that Lightstorm wanted to move forward and work with him to develop a feature film for theatrical

release that would combine live action with 3-D animation (the "*KRZ* Project," and together with the *KRZ* Story, *KRZ* Proposal, and all materials Ryder generated in connection with same, the "*KRZ* Materials").  With Ryder's *KRZ* Proposal sitting on the desk in front of him, Sanders went on to say, "Let's do it."

40.    Lightstorm, through its authorized agent Sanders, greenlit the *KRZ* Project for motion picture development and began developing motion picture material, research, and artwork references relating to the *KRZ* Story.  Sanders has expressly acknowledged that he "brought [the project] in [to Lightstorm] because [he] thought it had the potential to appeal to Jim [Cameron]."

41.    Although Sanders would later claim that he only saw the *KRZ* Story and never saw the full *KRZ* Proposal, evidence indicates that Sanders had obtained and reviewed a copy of the *KRZ* Proposal before the Initial Meeting.  At the Initial Meeting, Ryder observed that Sanders had a copy of the full Velo-bound *KRZ* Proposal on his desk while he discussed several elements that were addressed in the *KRZ* Proposal, but were not in the *KRZ* Story itself.  These included: (i) Lightstorm's desire to produce the motion picture as a feature film for theatrical distribution, as opposed to the internet distribution platform detailed in the *KRZ* Proposal; (ii) Lightstorm's desire to add live action in combination with 3-D animation, as opposed to the exclusive 3-D animation proposed in the *KRZ* Proposal; and (iii) the *KRZ* Proposal's reference to casting Sigourney Weaver as a character.  It strains credibility that Sanders would be aware of and discuss at length these *KRZ* Proposal-specific details without having seen and read the *KRZ* Proposal.  Moreover, in at least one subsequent meeting, when Sanders indicated that he did not have his copy of the *KRZ* Proposal immediately accessible at the time, Ryder personally handed to Sanders another copy of the *KRZ* Proposal as they continued to discuss its contents in furtherance of the *KRZ* Project.

42.    Ryder presented and disclosed the *KRZ* Story and Proposal to Sanders and Lightstorm in confidence and with the expectation and understanding that he

would be compensated and would receive writer and producer credits in the event any of the *KRZ* Materials were used in a motion picture released for commercial distribution or otherwise commercially exploited.

43.    Ryder's presentation and disclosure of the *KRZ* Materials to Sanders and Lightstorm, on the condition that the ideas and concepts presented by Ryder would not be disclosed or exploited without Ryder's consent and Ryder's receipt of appropriate compensation and credit, was consistent with the well-established customs and practices of the entertainment industry.

44.    At no time was Ryder asked to sign—nor did he sign—any document that waived his rights or assigned any right, title, or interest in the *KRZ* Materials to Lightstorm.  Nor did Lightstorm ever compensate Ryder in connection with the *KRZ* Project or for his services.  Ryder is informed and believes, and on that basis alleges, that Sanders', Cameron's, and Lightstorm's clear understanding was that if Lightstorm used any of the *KRZ* Materials to produce and release a film, Ryder would receive credit and compensation.

45.    In fact, pursuant to their discussion at the Initial Meeting and Lightstorm's acceptance of the *KRZ* Proposal—and Sanders' greenlighting of the *KRZ* Project—Ryder and Lightstorm entered into an express agreement and joint venture to develop *KRZ* as a hybrid 3-D animated/live action science-fiction epic derived from Ryder's *KRZ* Story involving anthropomorphic beings and a sinister, Earth-based corporation engaging in environmentally harmful mining or harvesting operations on the moon of a gas giant planet.

46.    According to Sanders, while he was working as Director of Development at Lightstorm, the *KRZ* Project underwent a "pretty extensive [ ] development process."  Indeed, Ryder and Lightstorm spent at least 10 and as many as 22 months performing their agreement.  During that time, Ryder met with Sanders at Lightstorm's offices on multiple occasions for meetings that lasted two to three hours each.  Sanders also asked Ryder to research and compile reference material for

topics relating to the *KRZ* Project, including mining practices and environmental devastation, Jupiter and its moons, and strange and unique flora and fauna.

47.    For the first several months following the Initial Meeting, Ryder, Sanders, Wald, and Baffo did the primary work on the *KRZ* Project. They then collectively decided to bring in a professional screenwriter, Stuart Hazeldine. Sanders asked Ryder to work with Hazeldine to prepare *KRZ* treatments and screenplays.

48.    Ryder, together with Hazeldine, authored three works derived from the *KRZ* Story, including: (i) a treatment drafted in or around 2000; (ii) a screenplay drafted in or around September 2001; and (iii) a revised screenplay drafted in or around December 2001. The ideas, characters, depictions, concepts, and elements used in the works include Ryder's independently copyrightable contributions, and Ryder's ownership in these works vested when his original expression was fixed in a tangible medium of expression. Ryder has registered his copyrights in all three works, along with his copyright in an additional, late 2000 *KRZ* treatment, with the United States Copyright Office (collectively, the "Ryder Copyrights").

49.    During the time period that Sanders was working on the *KRZ* Project, Sanders attended weekly Development Department meetings with Lightstorm executives. One of the reasons for the weekly meetings was to bring development projects to the attention of Lightstorm President Rae Sanchini and Lightstorm Chief Operating Officer and Cameron's producing partner Jon Landau, who routinely attended those meetings. According to Cameron, he ran his company through Landau and Sanchini, who served as Cameron's "seconds in command." If a project was not suitable for Lightstorm and Cameron, Sanchini and Landau would quickly reject the project so development executives like Sanders would not spend further valuable time on a fruitless project.

50.    Sanders introduced the *KRZ* Story at Lightstorm Development Department meetings, including to Landau and Sanchini, shortly after he received

KASOWITZ LLP
ATTORNEYS AT LAW
LOS ANGELES

COMPLAINT

the *KRZ* Story in early 2000, and Sanders told Lightstorm executives that he really liked the project. The *KRZ* Story and/or Project was on the Development Department weekly meeting agendas from that time to at least December 2000. In fact, the *KRZ* Project was listed each week for at least 10 months in Lightstorm's internal Development Department reports, on agendas for Development Department meetings, and in minutes circulated after the meetings.

51.    The weekly Development Department meetings were attended by Sanchini and Lightstorm Vice President Stacy Maes and, beginning in June 2000, by Landau as well. Sanders told Sanchini that he was passionate about the *KRZ* Project, gave Maes a copy of the *KRZ* Story draft to read and discussed it with her, and repeatedly raised the *KRZ* Project at weekly Development Department meetings.

52.    Senior Lightstorm executives, including Sanchini, Landau, and Maes, allowed Sanders to proceed and continue developing the *KRZ* Project in what Sanders later described as an intensive development process. Specifically, Sanders invested approximately 40 hours in meetings and teleconferences, reviewed drafts and provided notes and revisions, instructed Ryder, Wald, and Baffo to source images that would reflect aspects of the *KRZ* Story, and performed other work to advance the *KRZ* Project.

53.    Ryder and Lightstorm (including, but not limited to, Wald and Sanders) understood that the *KRZ* Story would not be submitted to other potential suitors while the *KRZ* Project was in development at Lightstorm.

54.    In or around December 2000, Landau, Sanchini, Maes, Ryder, Wald, Baffo, Sanders, and Hazeldine met to discuss the Ryder-Lightstorm joint venture to develop the *KRZ* Project. Hazeldine participated via telephone and presented the work product that was derived from Ryder's work and created with Ryder's active participation and feedback.

55.    In or around 2002, Lightstorm abruptly represented to Ryder that the *KRZ* Project was not feasible because no one would be interested in seeing an

KASOWITZ LLP
ATTORNEYS AT LAW
LOS ANGELES

COMPLAINT

environmentally themed science-fiction movie.

56.     However, unbeknownst to Ryder, Lightstorm had plans to develop a science-fiction movie franchise set in the distant future involving anthropomorphic beings and a sinister Earth-based company engaging in environmentally harmful mining operations on the moon of a gas giant planet—but instead of calling it *KRZ*, it would be called *Avatar*.

## II.     THE FIRST *AVATAR* MOVIE AND THE FIRST LAWSUIT

### A.     <u>The First *Avatar* Film</u>

57.     According to Cameron, he wrote a highly detailed script-length treatment in narrative form for *Avatar*—the Scriptment—in 1995, but in 1997 he decided not to go forward with the project because technology was not sufficiently developed to produce the film in the way he envisioned at the time.

58.     According to Cameron, by 2005, he and Landau determined that technology had sufficiently progressed to make *Avatar*, and Cameron wrote the first draft of the *Avatar* screenplay from December 2005 through May 2006 based on the Scriptment.

59.     Notwithstanding Lightstorm's contention that the *KRZ* Project was terminated in or around 2002, Lightstorm records reveal that in January 2006—the same time Cameron was purportedly drafting *Avatar*—Lightstorm personnel were accessing records for a revised *KRZ* screenplay re-titled as *The Adjuster*, and Lightstorm's own coverage writer had previously encouraged Lightstorm to consider the revised *KRZ* screenplay because of its "cool elements going for it, most notably the completely spectacular setting."

60.     According to Cameron, production for *Avatar* was greenlighted in January 2007, and principal photography began in April 2007.

61.     Landau and Cameron were producing partners on *Avatar*, and Sanchini worked as a producer on *Avatar* until she left Lightstorm in 2006.

62.     Before working on *Avatar,* Landau and Sanchini were involved in the

*KRZ* Project and had been exposed through many months of Development Department meetings, brainstorming sessions, and project supervision to the *KRZ* Project's story drafts and treatments, research compilations, artwork references, and ideas.

63.    During Lightstorm's intensive development of the *KRZ* Project, neither Sanders nor anyone else at Lightstorm ever disclosed to Ryder, Wald, or Baffo that Lightstorm had in its development cache a competing story that revolved around mining on the moon of a distant gas giant planet, written by Lightstorm's Chief Executive Officer, Cameron.

64.    *Avatar* premiered in London on December 10, 2009, and in the United States on December 18, 2009.

**B.    Ryder's Previous Lawsuit Against Cameron and Lightstorm**

65.    In December 2011, Ryder filed suit against Lightstorm and Cameron in the Los Angeles County Superior Court, and, in an amended complaint filed in March 2012, alleged claims for: (i) breach of fiduciary duty; (ii) breach of express contract; (iii) breach of implied contract; (iv) promissory fraud; (v) fraud and deceit; and (vi) negligent misrepresentation (the "First Lawsuit").

66.    Although Defendant Twentieth Century Fox was not a named defendant in the First Lawsuit, counsel for Twentieth Century Fox participated in the First Lawsuit extensively, including by attending and appearing on the record at depositions.

67.    Defendants Lightstorm and Cameron moved for summary judgment, and the Superior Court granted the motion, finding that: (i) Cameron's Scriptment established that Cameron independently created *Avatar* in 1996 before Ryder submitted the *KRZ* Story to Lightstorm, and (ii) after filtering out alleged similarities between *KRZ* and *Avatar* that appeared in the Scriptment, any remaining similarities between the two works were insufficient to establish substantial similarity. The California Court of Appeal agreed that the filtered elements were not substantially

similar and affirmed the summary judgment order. *See Ryder v. Lightstorm Ent. Inc.*, 246 Cal. App. 4th 1064 (2016).

68.    Significantly, although the Court of Appeal also upheld the grant of summary judgment on the contract and fiduciary duty claims, it did not adopt the trial court's finding that there was no triable issue of fact as to the existence of a joint venture or express contract.  Instead, the Court of Appeal assumed for the purposes of its decision that "Ryder's proposal created a binding contract with Lightstorm" and found that the claims nevertheless failed because the works were not substantially similar.

**III.    CAMERON AND LIGHTSTORM'S UNSUCCESSFUL ATTEMPT TO OBTAIN RYDER'S RIGHTS IN THE *KRZ* WORKS, AND DEFENDANTS' UNAUTHORIZED USE OF *KRZ* ELEMENTS IN *AVATAR 2***

69.    According to Cameron, he began thinking about a sequel to *Avatar* while he was writing the original *Avatar* screenplay in or around December 2005 through May 2006.  As discussed above, during that same time period, Lightstorm personnel were accessing a revised *KRZ* screenplay re-titled *The Adjuster*.

70.    During the First Lawsuit, Lightstorm did not produce its copy of *The Adjuster* in discovery and had no explanation of what happened to it.  During the First Lawsuit, Ryder also filed a motion to compel Cameron and Lightstorm to produce information concerning planned sequels, but the motion was denied after Cameron and Lightstorm vehemently opposed it, and the parties ultimately stipulated that information relating to sequels would not be disclosed.

71.    Ryder is informed and believes, and on that basis alleges, that the process for writing *Avatar 2* was particularly challenging as Cameron—who by his own admission felt he "had to create a greater [ ] mega story"—initially struggled to come up with new and compelling concepts that would drive forward the franchise, increase marketability, and satisfy his appetite for critical acclaim.  According to

Cameron, in or around July 2013, he launched a writers' room to begin writing screenplays for four *Avatar* sequels, but Cameron would not let the writers begin the drafting process until they reviewed approximately 800-1500 pages of notes Cameron purportedly independently generated in preparation for the sequels.  As discussed in detail below, the striking and substantial similarities between *KRZ* and *Avatar 2* support the inference that *KRZ* Materials were included or reflected in those notes.

72.    Cameron decided that the production of *Avatar 2* (and subsequent films) would not begin until the scripts for all four planned sequels were completed and approved.  Cameron's reasoning for this was that he wanted to approach the project as a full saga with a continuous story arc across all films, rather than working on individual sequels one at a time.  He compared this to having a blueprint for a house before starting construction.

73.    Principal photography and production on *Avatar 2* began in or around 2017 and wrapped in or around late 2020.

74.    Landau—who had extensive exposure to *KRZ*, including by virtue of his work with Sanders and the Lightstorm Development Department in the early 2000s as well as his involvement in the First Lawsuit—was a co-producer on *Avatar 2*.

75.    In or around May 2018, while *Avatar 2* was in production, Cameron and Lightstorm attempted to leverage a judgment they obtained against Ryder—in connection with costs awarded for the First Lawsuit—to acquire Ryder's intellectual property and related rights in *KRZ*.

76.    Specifically, Cameron and Lightstorm's attorney called Ryder and told him that Cameron and Lightstorm would forgo their right to receive from Ryder over $50,000 in costs if Ryder: (i) sold to them all of his rights concerning all things related to *KRZ*, and (ii) agreed never to sue them again over anything relating to *Avatar*, including sequels.

77.    On the call, Ryder asked Cameron and Lightstorm's attorney if she

knew that the single biggest difference between *KRZ* and the first *Avatar* movie was the setting, and that a few months earlier, Cameron had announced that *Avatar* sequels were in production and would be largely set underwater (like *KRZ*). Ryder went on to explain to the attorney that Cameron and Lightstorm were clearly planning to use his ideas and that these new similarities exposed them to renewed litigation. In fact, Ryder told Cameron and Lightstorm's counsel that he knew this was the reason their offer was conditioned on Ryder agreeing not to file suit regarding *Avatar* sequels, and Cameron's counsel did not disagree. Ryder told the attorney he was not interested and hung up the phone.

78.     After Cameron and Lightstorm were unsuccessful in their attempt to buy Ryder's rights to *KRZ*, they attempted to *force* Ryder to sell the rights. Specifically, on January 25, 2019, Cameron and Lightstorm filed a motion asking the court "for an order appointing [ ] a receiver to seize and sell [Ryder's] intellectual property and related rights in the work *KRZ*," including: (i) "[a]ny and all of Ryder's ownership rights, authorship rights, copyrights, and other rights in the treatment titled KRZ, which Ryder registered with the United States Copyright Office (Reg. No. PAu002566849)"; (ii) "[a]ny and all of Ryder's ownership rights, authorship rights, copyrights, and other rights in the story titled *K.R.Z. 2068*, which Ryder registered with the Writers Guild of America (Reg. No. 800986)"; (iii) "[t]he internet domain name www.KRZ2068.com"; and (4) "[a]ny and all of Ryder's ownership rights, authorship rights, copyrights, and other rights in *KRZ* – including any and all stories, plots, sequences of events, characters, dialogue, settings, dramatic gimmicks, themes, and visuals of *KRZ* – as embodied in . . . [t]he business proposal for *KRZ* . . . Ryder's four versions of the *KRZ* short story . . . [a]nother treatment for *KRZ* . . . [f]our screenplays for *KRZ* . . . [and] [a]ll documents, notes, drafts, images, and other property created by Ryder or at his direction in any form, including documentary and electronic form, relating to *KRZ*." Notice of Motion and Motion to Appoint Receiver, *Ryder v. Lightstorm Ent. Inc.*, No. BC474876 (Cal. Super. Ct. Jan. 25, 2019). In their

KASOWITZ LLP
ATTORNEYS AT LAW
LOS ANGELES

motion, Cameron and Lightstorm's counsel—a major entertainment law firm—requested that the father of one of their administrative assistants serve as the receiver.

79.    The writing was on the wall.  It was clear to Ryder that the *KRZ* rights were far more valuable to Cameron and Lightstorm than they had let on during the First Lawsuit, and this was their last-ditch attempt to silence him and enable them to convert his intellectual property to their use (and significant financial benefit) with impunity.  But Ryder, determined to retain his intellectual property rights, fought to marshal the more than $50,000 required to satisfy the judgment, and successfully retained his rights to *KRZ*.

80.    With production and/or development of *Avatar 2* and the other planned sequels well underway, and with *Avatar* having become the highest-grossing film of all time, the inability to acquire Ryder's rights lawfully was not going to stop Cameron and Lightstorm.  They fully intended to make use of *KRZ* intellectual property in *Avatar* sequels with or without Ryder's authorization, and that is precisely what they did.

81.    *Avatar 2* was released in the United States on December 16, 2022.  It was re-released theatrically on October 3, 2025.

82.    *Avatar 2* was distributed by TWDC's subsidiary 20th Century Studios in conjunction with Disney Home Entertainment.  TWDC indirectly owns the *Avatar* franchise through its ownership of 20th Century Studios.  Ryder is informed and believes, and on that basis alleges, that in addition to distributing *Avatar 2*, TWDC, through its subsidiaries 20th Century Studios and Disney Home Entertainment, was the primary entity funding and producing the film.

83.    In or around early 2018, Ryder sent letters to TWDC Chief Executive Officer Bob Iger and approximately three dozen Disney attorneys notifying Disney of his claims to intellectual property incorporated in the *Avatar* franchise.  He specifically noted that, based on Cameron's public statements at the time, the *Avatar* sequels were going to incorporate "key elements . . . found in *KRZ*."  Ryder went on

to expressly warn Disney that although Cameron had successfully escaped liability in the First Lawsuit, these new infringements would likely give Ryder a much stronger basis for a second suit. Disney and its attorneys ignored that warning.

84.    Ryder is informed and believes, and on that basis alleges, that in or around June 2023, Disney Plus began digitally hosting and distributing *Avatar 2* through its online streaming platform. In or around November and December 2024, Ryder sent cease-and-desist letters to Cameron, Lightstorm, and TWDC, notifying all parties that *Avatar 2* infringed on his intellectual property rights and requesting, among other things, that they cease and desist streaming *Avatar 2*, but Defendants ignored Ryder's requests. As of the date of this Complaint, *Avatar 2* is still available to stream on Disney Plus.

## IV.    THE SUBSTANTIAL SIMILARITY BETWEEN *AVATAR 2* AND RYDER'S COPYRIGHTED *KRZ* WORKS

85.    While there are a number of marked similarities between *KRZ* and *Avatar 2*, including with respect to plot, characters, setting, pace, dramatic gimmicks, and mood, there is one *major* story element in the *KRZ* Materials, including those protected by the Ryder Copyrights, that is also found in *Avatar 2*. This element, the harvesting of an animal-based substance that when refined can extend human life— essentially an animal-based antidote for aging—plays the same role in both stories.

86.    This element is not present in the first *Avatar* film or in Cameron's Scriptment. In fact, Cameron and Lightstorm expressly acknowledged during the First Lawsuit that this life-extending element was one of Ryder's *KRZ* ideas—not a concept from *Avatar*.

87.    Although not revealed and openly discussed until later in the film, this anti-aging substance is not a minor issue in *Avatar 2*. To the contrary, the need to continue harvesting the animals that supply this substance is one of the main motivations of the antagonists in the film.

88.    Ryder is informed and believes, and on that basis alleges, that the next

three *Avatar* films in the franchise will continue to focus on this life-extending substance as well as on the Tulkun, a 100-foot long whale-like aquatic animal whose gland is harvested to make the life-extending substance.

89.    This central story element leads to a number of similar and overlapping plot points, scenes, motivations, and actions by the main characters in *KRZ* and *Avatar 2*. These overlapping elements are wholly original to *KRZ*, and/or when combined through their selection, coordination and arrangement create an original combination that can be traced directly from *KRZ* to *Avatar 2*.

90.    Notably, although Cameron was successful in his claim of independent creation in the First Lawsuit, the basis for that claim is not applicable here, as the substantial similarities between *KRZ* and *Avatar 2* were not present in Cameron's Scriptment or the first *Avatar* film.

### A.    Similarity in the Setup of the Story

91.    The setups in *Avatar 2* and *KRZ* are not just similar—they are the same: a corporation has a monopoly to extract a highly valuable resource on the exotic moon of a gas giant planet, and when this extraction is stopped, the corporation sends an agent to find out what has gone wrong and restart the resource extraction.

92.    Both stories have a sinister corporation that either tasks or eventually supports the main antagonist of the story. This corporation is bent on extracting an animal-based resource from the environment. In *KRZ* this company is called Malloc Corporation; in *Avatar 2* the company is called the Resources Development Administration ("RDA").

93.    Both corporations have obtained a monopoly to extract the specified resource from the moon on which the story takes place and have free rein to do whatever is necessary to meet production quotas.

94.    At the beginning of both stories, production of the highly prized resource has stopped and needs to be restarted, and the central drive of the antagonists is to eliminate the cause of the disruption.

95.    Indeed, in both stories the setup for the plot centers on a main character being charged with finding the person who is responsible for stopping the corporation from being able to continue harvesting the prized resource and, if necessary, killing that person to permanently end the threat.  In *KRZ*, this is the direct order given to the main protagonist Kate Shepherd—to regain control of the base that harvests the resource by any means possible, even if that means eliminating a secondary protagonist named Kurtz who has been put in charge of the base.  Kurtz is an anthropomorphic being referred to as a "K.R.Z." model; K.R.Z.s along with their predecessor "K.R.Y." models are the avatars of the *KRZ* universe.  In *Avatar 2*, at the 00:16:20 mark, Colonel Quaritch gives orders to kill the leader of the Na'vi insurgency, Jake Sully, so that humans can continue to proceed with the resource extraction on Pandora.

96.    When these initial four elements of the setup—(i) an evil corporation, (ii) a monopoly to extract a valuable resource, (iii) production having been disrupted, and (iv) the drive to eliminate the disruptor—are combined with the next element, the actual substance that the corporation wants to extract, it becomes abundantly clear that all the previous elements are selected, arranged, and coordinated to support this idea, and do so in the same way—thus tying together all of these elements in a novel pattern of plot development, character action, dramatic gimmicks, and scene work.

97.    Specifically, in both stories, the sinister corporation is harvesting an animal-based substance that has an almost magical ability to extend life.  In *KRZ*, this substance is called Kahrs (which doubles as the name of the organism it comes from), and in *Avatar 2*, the substance is called amrita.  In both stories, this substance is the most expensive substance or medicine on Earth.  In *KRZ*, Kahrs is described as the most expensive, sought-after medicine ever put on the market, and in *Avatar 2*, amrita is described as the single-most valuable known substance in existence, with a single vial costing upwards of $80 million.

98.    In both stories, the substance is not actually used by any characters to

COMPLAINT

save themselves or others.  The substance is purely a "MacGuffin" that explains why the sinister corporation is on the planet, *i.e.*, to obtain the substance and eliminate any interference with its extraction.

99.    Notably, although the RDA was mining a different resource called Unobtanium (a superconductive energy source) in the first *Avatar* film, that central plot device was replaced in *Avatar 2* by a new and even more enticing resource—and one directly lifted from Ryder's copyrighted *KRZ* materials.  Specifically, according to the official *Avatar* website, "[w]hen [the protagonist] Jake successfully deposed the RDA mining operation [in the first *Avatar* film], he assumed that it would be some time before the RDA would successfully mount a counter-invasion by analyzing data about Earth's Unobtanium stores.  What he failed to consider was the discovery of amrita, a chemical compound found in Pandora's ocean-dwelling Tulkun population that effectively stops human aging."  Amrita therefore becomes central to the plot in *Avatar 2* as it is the reason for the RDA and the antagonists to return to Pandora ahead of schedule.  This need for a compelling reason to be on the planet is critical to Cameron and his development process.  According to an *Avatar 2* senior production supervisor, "from the first time it's on the page, Jim [Cameron] is thinking about the world that we're inhabiting and why we're there and why it makes sense for the characters to be there."

100.   This means that there was a conscious choice in *Avatar 2* to create a new resource for the RDA to find and harvest from the planet.  With all the possible options for a MacGuffin to choose from, *Avatar 2* chooses the exact same magical natural substance that *KRZ* uses.

101.   The substance is even visually presented in *Avatar 2* the same way Ryder chose to describe it in various *KRZ* Materials—as a glowing yellow substance in a glass vial.  The Kahrs description evolved throughout the life cycle of the *KRZ* Project, including with respect to color, but it is nevertheless abundantly clear that the final product in *Avatar 2* is derived from Ryder's work product.

| ***KRZ* Materials** | ***Avatar 2*** |
|---|---|
| **Description of Kahrs from *KRZ*:** <br><br> Kahrs is described as having a "…translucent … warm … yellow glow…" and as being contained in "slim … glass vials" | **Screenshot of amrita from *Avatar 2* at timestamp 2:02:19:** <br><br>  |

102.   In both stories the substance is also hunted/harvested the same way—with explosive underwater charges.

| ***KRZ* Materials** | ***Avatar 2*** |
|---|---|
| **Description of hunting Kahrs with explosives from *KRZ*:** <br><br> The base commander uses underwater "explosive charges to blow [the] Kahrs [organism] out of" volcanic vents. <br><br> *** <br><br> The base commander gives an order to detonate an explosive underwater charge "followed by a BIG BOOM, and the cockpit shakes . . . then the light blast fades to reveal a torrent of Kahrs cascading up" | **Screenshot and dialogue from *Avatar 2* where whalers are using explosive charges to hunt Tulkun and harvest amrita at timestamp 1:56:17:** <br><br> SCORESBY <br> Stand by depth charges . . . Fire! Fire! Fire! <br><br>  <br><br>  |

103.   This plot point—the sinister corporation's need to keep extracting a valuable life-extending substance from animals on a hostile moon and to eliminate any threat that could stop production—is lifted directly from *KRZ* and fitted into *Avatar 2* to provide motivation for the primary conflict between Sully and the RDA.

### B.   Similarity in Characters and Character Motivation

104.   In both *KRZ* and *Avatar 2*, anthropomorphic, human-like beings—either androids or avatars—are on both sides of the conflict and must face off against one another.  These beings share some of the same motivations and take some of the same material actions, further evidencing clear correlation between the two stories.

105.   In both stories, a biological being is created by a scientific process prior to the start of the story.  This being either is programmed to have the personality and intelligence of a human (in *KRZ*) or is a blank vessel that has a human personality downloaded into it (in *Avatar 2*).

106.   These anthropomorphic beings are central characters in both stories.  In *KRZ*, they are human-based androids who look human and either (in the case of the K.R.Y. model) serve as workers who perform menial and dangerous tasks for humans or (in the more advanced and updated K.R.Z. model) are almost indistinguishable from a human being in intelligence, with free will and genuine emotions.  In *Avatar 2* (as in the first *Avatar*), the avatars are ten-foot-tall blue humanoid Na'vi bodies that are remotely mind-linked in real-time to a human "driver" in a lab via a neural interface.

107.   A central twist in *Avatar 2* is that the antagonist of the first film, Colonel Quaritch, is resurrected by downloading his memories and personality into an avatar body called a "recombinant."  This recombinant/downloaded memories plot device in *Avatar 2* is the second avatar technology (*i.e.*, the way in which consciousness is transferred to and from an anthropomorphic being) depicted in the *Avatar* franchise, and it is plainly taken directly from *KRZ*, in which characters use "5senses" technology to transfer and download the memories of other humans and/or androids.

108. In both stories, avatars/androids also face off against each other. In *KRZ*, an updated model of the K.R.Y. android, the second-created K.R.Z. model, is the secret protagonist. The audience is told at the beginning of the story that there is only one model of the K.R.Z., and this model is on the Europa harvesting facility. At the beginning of act two, the main protagonist Shepherd meets this K.R.Z. android and is told its name is "Kurtz." Kurtz has taken over the mining facility to help protect the newly discovered aquatic ecosystem that is hidden under the oceans of Europa. Later it is discovered that Malloc, the sinister corporation, has created a second, more advanced version of the K.R.Z. model, which is given the name "Kary." In act three, Kary calls out Kurtz for battle to prove that it is the better version of the K.R.Z. model.

109. In *Avatar 2*, the protagonist is Jake Sully, the human who sheds his human body in the first *Avatar* film and has his consciousness permanently downloaded into his avatar body. Just as in *KRZ*, the original avatar, Jake, must now face off against his nemesis, Colonel Quaritch, who has been reborn (using the downloaded memory technology from *KRZ*) into his own avatar body. Just as in *KRZ*, in act three, Quaritch calls out Jake to prove that with his new avatar body he can finally defeat Jake in combat.

110. This faceoff between good and bad avatars mirrors the faceoff between the good K.R.Z. android model, Kurtz, and the bad K.R.Z. model, Kary. This is a change from the original *Avatar* movie, where the human avatars were always on the side of the Na'vi once conflict with the human military occupiers started. These similarly set-up characters have the same motivations and follow through with the same actions.

111. In both stories, the antagonist avatar/android also makes an offer to the local natives and attempts to enlist them in an effort to eliminate the protagonist avatar/android. In *KRZ*, Kary (the evil android) asks the human workers who live on Europa harvesting the Kahrs substance to revolt and hand over Kurtz and Shepherd.

If they do, the workers will be allowed to finish their work, get paid, and return home. In *Avatar 2*, Colonel Quaritch endeavors to have various Na'vi tribes—the natives that live on Pandora—give up Jake and the Sully family, proclaiming that if they do this, they will be left alone. In both stories, the antagonist makes this specific demand of the local population, either harvesters in *KRZ* or Na'vi tribes in *Avatar 2*, to deliver the protagonists, and if they do not, they will suffer fatal consequences. It is a similar scene, by the same type of character, with the same motivation, to try to get the same plot resolution: the handing over of the good guys to the bad guys.

112.    In both stories, the locals are hesitant to help the protagonists but ultimately do so after realizing their fates are aligned. In *KRZ*, the workers do not want to help Kurtz and Shepherd, and they even debate handing them over to Kary, but in the end, they realize that their only hope for defending the station is to join forces and stand with Kurtz and Shepherd. In *Avatar 2*, the Metkayina Clan, a Na'vi tribe that took in the Sully family, initially does not want to help defend Sully and his family against Quaritch, but ultimately realizes that only by fighting together will they be able to defeat the bad avatars and humans that are threatening their home.

113.    The human workers in *KRZ* (Kahrs harvesters) and the human workers in *Avatar 2* (amrita harvesters, referred to as whalers) have the same motives: they just want to make their production quotas, survive, and get home with their money. The need to meet the quota is brought up specifically by the leader of the group in both stories. In *KRZ*, the base commander's obsession with meeting his "precious quota" leads him to take unethical measures to accelerate harvesting, including by using explosive depth charges to hunt the creature, and this is what ultimately leads to his demise. In *Avatar 2*, the leader of the whalers states the need to meet quotas twice, once at the 1:39:57 mark, and again at the 1:47:49 mark, and his ruthless pursuit of the Tulkun (the whale that produces amrita), including by hunting it with explosive depth charges, causes him to lose his arm in a violent struggle.

114.    The foregoing elements are all underscored by romantic relationships

between humans and avatars.  In both stories, a human—either in human form or in avatar form—is emotionally and physically intimate with one of the anthropomorphic beings, and their relationship becomes central to the plot.

115.   The above list of character actions and motivations shows that the use of a humanoid substitute plays the same role in both stories.  These androids or avatars are on both sides of the conflict, and they want to best their opponent, not just reestablish control over the harvesting operation.  The character motivation in both instances is to prove that they are the better version of their model.  Then there is the action and motivation of the local population, either harvest workers or Na'vi ocean tribes, that are specifically asked by the main antagonist/bad guy to give up the protagonist/good guy of the story.  In both instances, the locals have the same hesitancy and in the end make the same decision to support the good guys after realizing their fates are aligned.  This was clearly laid out in *KRZ* and is mirrored in lockstep in *Avatar 2*, with conscious and intentional choices that change the story from the original *Avatar* film.

###     C.     A Major Overlap in the Central Plot and Action is the Harvesting of a Life-Extending Substance by the Human Workers or Whalers

116.   The main human characters in both stories are a group of workers who are on a moon of a gas giant planet, either Europa or Pandora, to extract the above-described highly prized organic substance that extends life.

117.   In *KRZ*, the human workers are the harvesters who use futuristic submersibles to dive to the bottom of Europa's oceans to harvest Kahrs —an animal-based life-extending substance—from animals living near volcanic vents.  In act three, the workers are convinced by the protagonist Shepherd to join in defending the workstation that is their home, realizing that if they do not win, the corporation they work for will likely kill them to cover up what has happened on Europa.  In *Avatar 2*, the human workers are the whalers who use futuristic submersibles to dive deep under the surface of Pandora's oceans to harvest amrita—an animal-based life-

extending substance—from whale-like creatures called Tulkun. The whalers are ordered by the antagonist of the film, Colonel Quaritch, to help hunt down the Sully family. To do this, the whalers will kill the Tulkun, with whom the Na'vi share a spiritual bond.

118. Even though these human groups choose different sides by the end of the respective stories, the setup is the same, and the purpose of the humans being on the exotic moon is the same: to fulfill corporation quotas by harvesting the animal substance that can extend life. For Cameron, the need to include in the story a compelling purpose or reason for the RDA being on the planet was not a small detail; according to interviews with Cameron and his production team, Cameron would not even allow his team to proceed with development until the reason was first solidified, and by his own admission, that reason then formed the central foundation for the other elements in the story.

119. The life-extending substance plays the same role in both stories. It has been found to extend life, it is the most valuable substance in existence, it is in extremely high demand on Earth, and it is the main reason why the sinister corporation is on the planet. In *Avatar 2*, the lead whaler even proclaims that "amrita is what's paying for everything [ ] on Pandora now."

120. The other role that the life-extending substance plays in both stories is to introduce a biological life cycle with which the main characters have a spiritual connection. In *KRZ*, this bond is made by Kurtz, who at first appears to be the bad guy, but in a plot twist becomes the co-hero of the movie. Kurtz killed the original human boss of the harvesting operation to try to protect the Kahrs organisms and their role in creating a sustainable biosphere on the ocean floor that allows for astounding life to flourish in the oceans of Europa. The reveal of this incredible biological system helps to turn Shepard against her employer to protect the Kahrs and the environment. In the end, she assumes Kurtz's role as guardian of the Kahrs and Europa's biosphere from further unregulated exploitation.

KASOWITZ LLP
ATTORNEYS AT LAW
LOS ANGELES

COMPLAINT

121.   The turn to fully support the protagonist trying to fight off the bad guys who want to exploit the moon's natural resources is also mirrored in *Avatar 2* when the Metkayina Clan no longer stands on the sidelines but joins in the fight with the Sully family to defeat Colonel Quaritch and his whaling allies.  The Metkayina have a strong spiritual connection with the Tulkun, so when the Tulkun are hunted and killed by the whalers to extract the amrita, the Na'vi are personally hurt, and this provides the ultimate motivation to align with the Sully family against the antagonists.

**D.     Further Similarities in Setting, Dramatic Gimmicks, and Story Arc**

122.   The settings, dramatic gimmicks, and story arcs in both films are also substantially similar.

123.   Both *KRZ* and *Avatar 2* are set in a water environment and showcase a vibrant ocean ecosystem.

124.   In both stories, the plot is broken into three parts, starting in an initial place of "home," then moving to a new "home," and then in act three, having to defend that home.  While this might arguably be the basic structure of many films, the originality of the selection, arrangement, and coordination becomes apparent in act three of both stories, where another major overlap occurs as the action moves to revolve around the sinister corporation's water-based station—the harvesting base in *KRZ* or the whaling ship in *Avatar 2*.

125.   In the third act of both stories, the action set pieces jump back and forth between the outside water environment and the inside of the base or ship and show the main android and avatar characters facing off in multiple action set pieces.

126.   Both stories also make a point of highlighting how the actions of the sinister corporation will cause the balance of this ecosystem to unravel.  As a story device, this plot point plays the same role in both stories, and by the end, it is clear that a strong environmental or conservationist message is being voiced by the

KASOWITZ LLP
ATTORNEYS AT LAW
LOS ANGELES

1    protagonist.  In *KRZ*, Kurtz has gone against his employers because he wants to save

2    the fragile environment, which he finds beautiful and in need of protection.  In *Avatar*

3    *2*, the wanton destruction of the Tulkun by the whalers is what finally pushes the

4    aquatic Na'vi tribes to stand up against Colonel Quaritch and his crew.

5        127.   Both stories also include a number of strikingly similar marine-oriented

6    dramatic gimmicks, including, but not limited to, an illuminated 3-D map depicting

7    the beneath-the-surface ecosystem, mini submarines, tentacled submersibles, and

8    myriad deep-sea sequences, including a markedly similar remote-control minisub

9    battle sequence.

16                         [The remainder of this page is intentionally left blank]

17                              [Allegations continued on the next page]

KASOWITZ LLP
ATTORNEYS AT LAW
LOS ANGELES

COMPLAINT

| ***KRZ* Materials** | ***Avatar 2*** |
|---|---|
| **Illuminated table map technology depicting life below the surface as described in *KRZ* Materials**:<br><br>"the entire table [ ] light[s] up, revealing an enormous map of the ocean floor" | **Screenshot of illuminated table map depicting life below the surface from *Avatar 2* at timestamp 1:54:37**:<br><br> |
| **Two of the many examples of the "minisub" technology described in *KRZ* Materials**:<br><br>"The minisub drops into glowing water, a shower of bubbles billow around it and its forward searchlights kick in."<br><br>***<br><br>"The engines of the minisub activate and it powers forward." | **Screenshot of minisub in *Avatar 2* at timestamp 1:56:20**:<br><br> |
| **One-man walking submersibles ("Walkers") described in *KRZ* Materials**:<br><br>"'Walkers' [are] piloted by K.R.Y.'s, [and] are bottom crawlers [that] have 4 octopus like tentacles." | **Screenshot of "Crab Suit" walking submersible in *Avatar 2* at timestamp 2:11:12**:<br><br> |

KASOWITZ LLP
ATTORNEYS AT LAW
LOS ANGELES

COMPLAINT

| | |
|---|---|
| **_KRZ_ describes a bad guy operating a minisub being defeated when another character takes control of the minisub remotely:**<br><br>Kurtz "take[s] charge of the sub [remotely], maneuvering it backward . . . . **_The pilot looked down at his now ineffective controls_**," as Kurtz steers the minisub into a collision that **_destroys the "cockpit canopy of [the] sub_**," and "[a]n **_explosion of bubbles turn[s] the sea frosty white_**." (emphasis added). | **Screenshot of character in _Avatar 2_ taking remote control of a bad guy's minisub and guiding it into a collision that causes the cockpit canopy to explode, turning the sea frosty white, beginning at timestamp 2:24:17:**<br><br><br><br><br><br> |

KASOWITZ LLP
ATTORNEYS AT LAW
LOS ANGELES

COMPLAINT

128.   Cameron and Lightstorm knew that these elements were taken from *KRZ*. In fact, during the First Lawsuit, in opining that the first *Avatar* film and *KRZ* were dissimilar, Cameron and Lightstorm's expert witness gave significant weight to his view that *KRZ* "depicts the nuts-and-bolts of [a] deep sea harvesting operation" and "[a] lot of the action occurs underwater, in mini-submarines," while "*Avatar* does not depict the nuts-and-bolts of its mining operation, nor does it contain any deep sea sequences." While those distinctions might have been true with respect to the first *Avatar*, as depicted above, *Avatar 2* adopts exactly what Cameron and Lightstorm's own expert ascribed as central elements of *KRZ*: it depicts the nuts and bolts of the RDA's underwater mining operation, a substantial portion of the film contains deep sea sequences, and a lot of the action occurs underwater in minisubs.

**E.     The Key Story Concept Creates an Original Pattern that Is Clearly Taken from *KRZ* and Is Set Up to Continue in Future *Avatar* Films**

129.   Ryder is informed and believes, and on that basis alleges, that the life-extending substance amrita and its animal source the Tulkun are central to the plot of future installments of the *Avatar* franchise, including *Avatar: Fire and Ash* ("*Avatar 3*"), which is slated for theatrical release in the United States on December 19, 2025.

130.   In fact, Ryder is informed and believes, and on that basis alleges, that the role of amrita, including its relationship to volcanic vents and volcanoes (from which Kahrs is harvested in *KRZ*), will expand in *Avatar 3*—which according to reports will be set primarily in volcanic regions—in fueling conflict between Na'vi, avatars, and humans.

131.   Ryder is informed and believes, and on that basis alleges, that the head whaler Captain Mike Scoresby makes a return in *Avatar 3* and seeks revenge on the Tulkun. According to the official *Avatar* website, his "sole focus is to hunt as many [T]ulkun as possible." Ryder is further informed and believes, and on that basis alleges, that researcher Dr. Ian Garvin, who in *Avatar 2* clashed with Scoresby and Quaritch over the cruel hunting of the Tulkun and harvesting of amrita, also returns

1    in *Avatar 3*.

2    132.    The continuing role of the Tulkun and the fight over the life-extending

3    substance amrita is evident.  The concept is important and central to the franchise,

4    and its setup in *Avatar 2* is key to understanding how the story continues in the

5    following movies.

6    133.    This main concept creates an original pattern of similarities between

7    *KRZ* and *Avatar 2*.  This pattern starts with original elements—or non-original

8    elements selected, arranged, and coordinated in an original way—in *KRZ* and ends

9    up in the same story, scene events, and character actions and motivations in *Avatar 2*.

10    134.    The overall similarity is further underscored by the fact that *KRZ* and

11    *Avatar 2* are both science-fiction stories set in an aquatic environment on a moon-

12    like planet.  Although the similar environment alone is not enough to establish

13    substantial similarity, its role within the selection, coordination, and arrangement of

14    the creative works in *Avatar 2*, as evidenced by an analysis of the plot, characters and

15    themes, reveals that the parallels move well beyond mere similarity and into the realm

16    of blatant infringement.

17    135.    Indeed, the setup that drives the reason the main characters on both sides

18    of the conflict are brought together and that propels the action and some of the main

19    character motivations is not just similar, *it is the same in both stories*.  A corporation,

20    given a monopoly to extract natural resources on the moon, has found an almost

21    magical substance, created by a living creature, that is of immense economic value

22    on Earth and is being harvested or hunted by human crews.  If that is not enough, the

23    actual substance, Kahrs or amrita, is not only described as having the same magical

24    property—it can extend life—but even has the same physical presentation and

25    manner of collection—a glowing yellow liquid contained in glass vials, harvested

26    from an oceanic animal host that is hunted with explosive underwater charges in

27    conjunction with mini-submersibles and tentacled/crab-like machines that "walk"

28    underwater.

136.   It is not plausible that all these elements would show up the same way, for the same purpose, and with the same result if there was not some memory and use of the *KRZ* Materials.  This indicates a prior contact with the *KRZ* stories, treatments, and screenplays, including those protected by the Ryder Copyrights.

137.   Ryder is informed and believes, and on that basis alleges, that Cameron faced artistic and commercial pressure to incorporate in *Avatar 2* new story architecture that would make the sequel appear fresh and sustain audience interest. After Cameron and Lightstorm failed in their efforts to acquire Ryder's rights, rather than lawfully license original material or independently create new narrative architecture, they accessed Ryder's confidential materials, including those stored on Lightstorm databases, and mined Ryder's *KRZ* Materials to supply the sequel's most distinctive new elements—misappropriating the very innovations that gave the sequel its commercial vitality (making it the third-highest grossing film of all time) and that, on information and belief, will set up the central conflict for future franchise installments.

138.   In doing so, Defendants turned to Ryder's proprietary and confidential creative work as a ready-made source of "new" content.  When creative decisions needed to be made in *Avatar 2*, with the complete freedom to choose any creative path, the default to what was already laid out in *KRZ* is clear.  The sequel's most novel and market-differentiating elements are not original to Defendants at all, but instead were drawn directly from Ryder and *KRZ*.

## **FIRST CAUSE OF ACTION**

### **Copyright Infringement – 17 U.S.C. §§ 106 and 501**

### **(Direct, Contributory, and Vicarious)**

### **(Against All Defendants)**

139.   Ryder repeats and realleges each and every allegation contained in Paragraphs 1 through 138, above, as though set forth fully herein.

140.   Ryder is the owner of the Ryder Copyrights, which cover original works

fixed in a tangible medium of expression.

141.   Defendants had access to the works protected by the Ryder Copyrights, including through Ryder's submission and cultivation of same in furtherance of the *KRZ* Project as well as by virtue of Defendants' involvement in the First Lawsuit in which all of the relevant materials were submitted as exhibits, Cameron's and Lightstorm's reference to the works in connection with their unsuccessful attempt to obtain the works through judgment enforcement measures, and Ryder's identification of the works in connection with his issuance of cease-and-desist letters.

142.   On information and belief, Defendants have produced, reproduced, prepared derivative works based upon, distributed, publicly performed, and/or publicly displayed Ryder's protected work and/or derivatives of Ryder's protected work without Ryder's consent.  Defendants' acts violate Ryder's exclusive rights under the Copyright Act, 17 U.S.C. §§ 106 and 501, including, but not limited to, Ryder's exclusive rights to produce, reproduce, and distribute copies of his work, to create derivative works, and to publicly perform and display his work.

143.   The December 16, 2022 United States theatrical release of *Avatar 2* and the October 3, 2025 limited theatrical re-release of *Avatar 2* each constitutes a separate and independently actionable act of copyright infringement.

144.   Defendants' infringement and substantial contributions to the infringement of Ryder's copyrighted work were done knowingly, without Ryder's consent, for commercial purposes, and for Defendants' financial gain.

145.   Defendants failed to exercise their right and ability to supervise persons within their control to prevent such persons from infringing Ryder's copyrighted work, and did so with the intent to further their financial interest in the infringement of Ryder's work.  Accordingly, Defendants have directly, contributorily, and vicariously infringed Ryder's copyrighted work.

146.   As a direct and proximate result of Defendants' infringing acts, Ryder has suffered damages, including, but not limited to, lost licensing fees, lost profit

participation, loss of control over the exploitation of Ryder's creative work, and other economic and reputational harm.  By virtue of Defendants' infringing acts, Ryder is entitled to recover his actual damages and Defendants' profits in an amount to be determined at trial, Ryder's attorneys' fees and costs of suit, and all other relief allowed under the Copyright Act.

147.  Defendants' infringement has caused, and continues to cause, irreparable harm to Ryder, for which Ryder has no adequate remedy at law.  Unless this Court restrains Defendants from infringing Ryder's protected works, this harm will continue to occur in the future.  Accordingly, Ryder is entitled to preliminary and permanent injunctions restraining Defendants, their agents, employees, officers, directors, representatives, and all other persons acting in concert with or for them from further and continuing acts of infringement.

## SECOND CAUSE OF ACTION

### Breach of Contract

### (Against Cameron and Lightstorm)

148.  Ryder repeats and realleges each and every allegation contained in Paragraphs 1 through 138, above, as though set forth fully herein.

149.  Ryder and Defendants Lightstorm and Cameron entered into a valid and binding express written agreement governing the submission, evaluation, development, and authorized use of Ryder's creative materials when Lightstorm accepted the *KRZ* Story and *KRZ* Proposal for development into a hybrid 3-D animated/live action feature-length motion picture.

150.  Ryder has performed all conditions, covenants, and promises required on his part in accordance with the terms and conditions of his agreement with Lightstorm.

151.  The *KRZ* Proposal, to which Defendants Lightstorm and Cameron agreed to be bound, required that they would, among other things, not "copy, reproduce, or distribute to others this Proposal, in whole or in part, at any time

without the prior written consent" of Ryder, and "keep permanently confidential all information contained herein not already in the public domain."

152. Lightstorm and Cameron materially breached their agreement with Ryder by, among other things: (i) using Ryder's submitted materials for commercial production purposes rather than limited evaluation; (ii) creating, producing, marketing, and distributing a sequel motion picture that incorporated Ryder's protected and confidential materials without Ryder's written consent; (iii) failing to negotiate or execute any license or purchase agreement prior to such use; (iv) failing to provide Ryder with any credit, compensation, or backend participation as expressly required; (v) disclosing and exploiting Ryder's materials beyond the scope permitted by the agreement, including by incorporating them—without authorization, consent, or compensation—into the development, production, marketing, and distribution of *Avatar 2*; and (vi) acting in bad faith to appropriate the commercial value of Ryder's work while avoiding the express cost and consent requirements set forth in the agreement.

153. Cameron's and Lightstorm's breaches were willful, intentional, and substantial, and went to the core purpose of the agreement, thereby depriving Ryder of the fundamental benefits of his bargain.

154. Cameron's and Lightstorm's failed post-litigation attempt to purchase Ryder's rights, followed by their unilateral exploitation of Ryder's work, constitutes additional evidence of their knowing breach of their express agreement and bad-faith intent to evade their contractual obligations.

155. As a direct and proximate result of Cameron's and Lightstorm's breaches, Ryder has suffered damages including, without limitation, lost licensing and purchase fees, lost profit participation and backend revenues attributable to *Avatar 2* and its derivative exploitations, reliance damages incurred in connection with development and submissions, loss of control over exploitation of Ryder's creative work, and consequential and incidental damages.

156.   Cameron and Lightstorm have been unjustly enriched by retaining the revenues and commercial benefits derived from their breach of the agreement.

157.   Accordingly, Ryder is entitled to all damages available under California law, including expectancy, reliance, and consequential damages, as well as disgorgement of profits to the extent permitted.

158.   Because monetary damages alone are inadequate to remedy the ongoing harm, Ryder is further entitled to specific performance and injunctive relief prohibiting Cameron and Lightstorm from continuing to exploit works created in breach of their contractual obligations.

## THIRD CAUSE OF ACTION

### Breach of Confidence

### (Against Cameron and Lightstorm)

159.   Ryder repeats and realleges each and every allegation contained in Paragraphs 1 through 138, above, as though set forth fully herein.

160.   Ryder conceived, developed, and owns novel, original, proprietary, and confidential creative materials, including but not limited to motion-picture concepts, character designs, plot frameworks, thematic elements and narrative structures, as reflected in—and generated in conjunction with the performance of—the *KRZ* Proposal (the "Confidential Materials").

161.   Ryder disclosed the Confidential Materials to Lightstorm and Cameron for the limited and specific purpose of evaluation, collaboration, and/or joint commercial exploitation, under circumstances creating a reasonable and enforceable obligation of confidence under California law.  In doing so, Ryder entered into an express confidential relationship with Lightstorm and Cameron, including as evidenced by the written agreement in the *KRZ* Proposal.

162.   Lightstorm and Cameron voluntarily accepted Ryder's disclosure of the Confidential Materials, knowing that: (i) the Confidential Materials were novel, original, and proprietary to Ryder; (ii) the Confidential Materials were being

disclosed in confidence; and (iii) the use of any of Ryder's novel ideas or materials in any motion picture, television program, merchandise, or otherwise, whether by Cameron, Lightstorm, or any of their affiliates, carried with it an obligation to, *inter alia*, compensate and credit Ryder for such use.

163.   After receiving and retaining the Confidential Materials, Lightstorm and Cameron wrongfully used and exploited those materials for commercial purposes beyond the scope of any authorized evaluation or collaboration.

164.   Lightstorm and Cameron misappropriated Ryder's Confidential Materials by incorporating them—without authorization, consent, or compensation—into the development, production, marketing, and distribution of *Avatar 2*.

165.   The similarities between Ryder's Confidential Materials and *Avatar 2* did not appear in Cameron's preexisting materials and became manifest only after Lightstorm and Cameron had access to Ryder's Confidential Materials, demonstrating unauthorized use and appropriation.

166.   Lightstorm's and Cameron's use of Ryder's Confidential Materials was not merely incidental or inspired by general ideas, but involved the appropriation of Ryder's specific expressive choices, structural elements, character configurations, and narrative sequencing disclosed in confidence.

167.   Lightstorm's and Cameron's unauthorized use of Ryder's Confidential Materials constituted a breach of the duty of confidence owed to Ryder under California common law.

168.   As a direct and proximate result of Lightstorm's and Cameron's breach of confidence, Ryder has suffered damages, including, but not limited to, lost licensing fees, lost profit participation, loss of control over the exploitation of Ryder's creative work, and other economic and reputational harm.

169.   Lightstorm's and Cameron's conduct was despicable and carried out with a willful and conscious disregard for Ryder's rights, thereby making them guilty

KASOWITZ LLP
ATTORNEYS AT LAW
LOS ANGELES

of malice.  As such, Ryder is entitled to exemplary and punitive damages to the fullest extent permitted by California law.

170.   Because monetary damages alone are inadequate to remedy the ongoing harm, Ryder is entitled to injunctive relief prohibiting Lightstorm and Cameron from further use, disclosure, exploitation, or commercialization of Ryder's Confidential Materials and all works derived therefrom.

171.   Ryder is entitled to restitution and disgorgement of Lightstorm's and Cameron's unjust gains.

## FOURTH CAUSE OF ACTION

### Unfair Competition – *Cal. Bus. & Prof. Code* §§ 17200, *et seq.*

### (Against All Defendants)

172.   Ryder repeats and realleges each and every allegation contained in Paragraphs 1 through 171, above, as though set forth fully herein.

173.   By engaging in the conduct alleged above, Defendants have engaged in unlawful, unfair, and/or fraudulent business acts of unfair competition in violation of California Business and Professions Code §§ 17200, *et seq.*  Such conduct includes, *inter alia*, Defendants' breach of confidence and inducement of breach of confidence, Defendants' interference with Ryder's ability to compete by diluting the value of *KRZ* and by failing to disclose Ryder's role in conceiving of and creating *Avatar 2*, and Defendants' misrepresentations to consumers, the entertainment industry, and others in the public that Defendants conceived of created, produced, and/or distributed *Avatar 2* without any participation or contribution by Ryder.

174.   Defendants' conduct is "unlawful" within the meaning of § 17200 because it violates multiple independent laws, including but not limited to: (i) California common law, by breaching duties of confidence owed to Ryder in connection with Ryder's confidential submissions and proprietary creative materials; and (ii) California contract law, by breaching express and/or implied agreements governing the authorized use, evaluation, and exploitation of Ryder's creative work.

175.   Defendants' conduct is "unfair" within the meaning of § 17200 because it offends established public policy and is immoral, unethical, oppressive, and substantially injurious to competition and to independent creators.

176.   Defendants' unfair practices include, but are not limited to: (i) misappropriating Ryder's intellectual property and confidential creative materials rather than lawfully licensing them; (ii) introducing into *Avatar 2* expressive elements that were absent from Defendants' preexisting materials and that appeared only after Defendants had access to Ryder's submissions; (iii) exploiting those materials for massive commercial gain while excluding Ryder from creative control, credit, and compensation; (iv) externalizing the costs of lawful development onto Ryder while internalizing the profits of the sequel; and (v) using Defendants' superior market power and control over distribution to suppress Ryder's ability to compete in the marketplace for similar creative works.

177.   The gravity of the harm to Ryder and to the marketplace for creative works substantially outweighs any countervailing benefits of Defendants' conduct. Defendants' practices undermine the integrity of the entertainment-industry submission system and distort fair competition by rewarding misappropriation over lawful licensing.

178.   Defendants' conduct is "fraudulent" within the meaning of § 17200 because it is likely to deceive members of the public and industry participants. Defendants' fraudulent conduct includes, but is not limited to: (i) holding out *Avatar 2* as the product of lawful and original development, despite its unlawful incorporation of Ryder's proprietary materials; (ii) concealing Defendants' misuse of Ryder's confidential submissions and co-owned creative expression; (iii) failing to disclose Ryder's authorship interest and entitlement to participation; and (iv) marketing and distributing *Avatar 2* in a manner that falsely implies Defendants' exclusive creative ownership.

179.   Defendants' acts and omissions were likely to deceive a reasonable

consumer, business partner, and market participant regarding the true origin, authorization, and ownership of *Avatar 2* and related derivative works.

180.   Ryder has suffered injury in fact and lost money or property as a result of Defendants' unfair competition, including, but not limited to, lost licensing fees, lost profit participation and backend revenues, lost opportunities to develop and exploit Ryder's work independently or with other partners, diminution in the commercial value of Ryder's intellectual property and confidential materials, and out-of-pocket expenses incurred in attempting to protect Ryder's rights.

181.   Defendants have unjustly retained revenues and profits obtained through unfair competition, including gross and net proceeds attributable to *Avatar 2* and its derivative exploitation.

182.   Ryder seeks restitution of all money and property wrongfully obtained, as well as disgorgement of Defendants' ill-gotten gains, to restore Ryder and the marketplace to the status quo ante.

183.   Defendants' unlawful, unfair, and fraudulent practices are ongoing and threaten to continue unless restrained by this Court.  Ryder seeks preliminary and permanent injunctive relief prohibiting Defendants from continuing to: (i) exploit the infringing *Avatar 2* and related derivative works; (ii) use or disclose Ryder's confidential materials; (iii) misrepresent Ryder's exclusive ownership of the underlying creative expression; and (iv) continue the unfair business practices alleged herein.

184.   Defendants' liability under § 17200 is independent of and in addition to their liability for copyright infringement, breach of contract, and breach of confidence, and is grounded in Defendants' broader pattern of unlawful commercial conduct, misuse of confidential information, misrepresentation, and market distortion.

185.   Ryder therefore seeks all relief authorized under Business and Professions Code §§ 17203 and 17204, including restitution, disgorgement,

1    injunctive relief, costs, and such other relief as the Court deems just and proper.

2    **PRAYER FOR RELIEF**

3    WHEREFORE, RYDER prays for judgment against Defendants as

4    follows:

5    1.    That Defendants be adjudged to have infringed the Ryder

6    Copyrights;

7    2.    That Defendants be preliminarily and permanently enjoined from

8    infringing the Ryder Copyrights, including: (i) producing, reproducing, preparing

9    derivative works based on, distributing, performing, or displaying any work that is

10   substantially similar to the protected *KRZ* Materials; (ii) producing, reproducing,

11   preparing derivative works based on, distributing, performing, or displaying the

12   works protected by the Ryder Copyrights or other *KRZ* Materials; (iii) producing,

13   reproducing, preparing derivative works based on, distributing, performing, or

14   displaying books, toys, video games, costumes, and/or other merchandise based on

15   the Ryder Copyrights, the *KRZ* Materials, or *Avatar 2*; and (iv) engaging in any other

16   action that infringes Ryder's intellectual property rights, including the Ryder

17   Copyrights;

18   3.    That Defendants be preliminarily and permanently enjoined from

19   engaging in further acts of unfair competition;

20   4.    That Defendants' products and materials that infringe the Ryder

21   Copyrights, as well as Defendants' plates, molds, matrices, masters, tapes, film

22   negatives, and other articles by means of which copies of the works embodied in the

23   Ryder Copyrights may be reproduced, be impounded pursuant to 17 U.S.C. § 503(a)

24   and/or destroyed pursuant to 17 U.S.C. § 503(b);

25   5.    That Defendants be required to account to Ryder for all profits

26   derived from their use of Ryder's intellectual property and their production,

27   reproduction, preparation of derivative works based on, distribution, performance,

28   and display of *Avatar 2* or  merchandise derived from *Avatar 2* in all media, from all

sources, worldwide;

6.      That Defendants be required to disgorge all ill-gotten gains from their use of Ryder's Confidential Materials and intellectual property and from their production, reproduction, preparation of derivative works based on, distribution, performance, and display of *Avatar 2* or merchandise derived from *Avatar 2* in all media, from all sources, worldwide;

7.      That Ryder be awarded restitution and all damages, including future damages, that Ryder has sustained, or will sustain, as a consequence of the acts complained of herein, and any profits derived by Defendants as a result of said acts, or as determined by said accounting, in an amount not readily ascertainable but believed to be in excess of $500 million;

8.      That Ryder be awarded punitive damages as result of Cameron's and Lightstorm's deliberate, wanton, willful, and malicious conduct, in an amount sufficient to punish, deter, and make an example of Defendants for their conduct alleged herein;

9.      That Ryder be awarded the full costs of this action and his reasonable attorneys' fees and expenses;

10.      That Ryder be awarded pre- and post-judgment interest on all applicable damages; and

11.      That Ryder be awarded such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all issues and causes of action triable by jury.

Dated:        December 15, 2025              KASOWITZ LLP


                                            By: */s/ Daniel A. Saunders*
                                               Daniel A. Saunders
                                               Dwayne A. Amos

                                               *Attorneys for Plaintiff Eric Ryder*

KASOWITZ LLP
ATTORNEYS AT LAW
LOS ANGELES

COMPLAINT