**JS-6**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 25-11854-GW-KSx | Date | October 1, 2026 |
| Title | *Eric Ryder v. James Cameron, et al.* | | |

| | |
|---|---|
| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE |

| | | |
|---|---|---|
| Javier Gonzalez | None Present | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| | |
|---|---|
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| None Present | None Present |

**PROCEEDINGS: IN CHAMBERS - FINAL RULINGS ON DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT [59]; and DEFENDANTS' MOTION TO STRIKE PLAINTIFF'S FIRST AMENDED COMPLAINT, PURSUANT TO CALIFORNIA'S ANTI-SLAPP STATUTE [60]**

Attached is the Court's Final Rulings on Defendants' Motions [59, 60]. The Court (1) GRANTS the Motion to Dismiss; and (2) DENIES as MOOT the Anti-SLAPP Motion. As mentioned, the Court previously granted leave to amend to address certain deficiencies identified. Plaintiff Ryder has elected to stand on the First Amended Complaint rather than amend. Accordingly, the Court dismisses the First Amended Complaint without further leave to amend.

: 

Initials of Preparer JG

***Eric Ryder v. James Cameron et al***; Case No. 2:25-cv-11854-GW-(KSx)
Final Rulings on Motion to Dismiss and Anti-SLAPP Motion to Strike Plaintiff's State Law Claims

Before the Court are the Motion to Dismiss Plaintiff's First Amended Complaint (the "MTD") and the Anti-SLAPP Motion to Strike Plaintiff's State Law Claims (the "Anti-SLAPP Motion") filed by Defendants James Cameron; Lightstorm Entertainment, Inc.; 20th Century Studios, Inc.; The Walt Disney Company; Buena Vista Home Entertainment, Inc. d/b/a Walt Disney Studios Home Entertainment; and Disney Streaming Services, LLC (collectively, "Defendants"). *See* MTD, Docket No. 59; Anti-SLAPP Motion, Docket No. 60. Plaintiff Eric Ryder ("Ryder") filed oppositions to both motions. *See* Opposition to Defendants' MTD ("MTD Opp."), Docket No. 65; Opposition to Defendants' Anti-SLAPP Motion ("Anti-SLAPP Opp."), Docket No. 66.

Prior to the hearing date on the pending motions, the Court issued a "tentative ruling" (Docket No. 70), explaining its initial position to grant the MTD with leave to amend and deny the Anti-SLAPP Motion as moot. On July 30, 2026, the Court: (1) granted the MTD with leave to amend, and (2) denied as moot the Anti-SLAPP Motion. *See* Docket No. 71. Ryder subsequently notified the Court that he elects to stand on his complaint and seek appellate review rather than amend. *See* Docket No. 76; *see also Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1064-65 (9th Cir. 2004) (explaining that a plaintiff may obtain an appealable final judgment by filing in writing a notice of intent not to file an amended complaint). The Court therefore issues this amended order/final ruling, which supersedes its tentative ruling.

## I. Background[1]

Ryder is the author of *KRZ*, an "environmentally themed science-fiction story" based on Joseph Conrad's novel *Heart of Darkness*. *See* First Amended Complaint ("FAC"), Docket No. 52, ¶ 35; Declaration of Kelly M. Klaus ("Klaus Decl."), Ex. 7 ("KRZ Draft 1"), Docket No. 61-8, at 1165. Defendants were involved in the creation and

[1] For the purposes of this MTD, the Court accepts all well-pleaded factual allegations in the complaint as true. *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 195 (2024). This background section also draws from materials judicially noticed or incorporated by reference in the FAC, *see infra*, Section II.B.

distribution of the *Avatar* movie franchise; they include, among others, James Cameron ("Cameron"), who wrote and directed the films, and Lightstorm Entertainment ("Lightstorm"), the motion picture production company that developed the films.

Ryder worked on the initial drafts of *KRZ* between 1996 and 1998. *See* FAC ¶ 35. Ryder then presented *KRZ* to Lightstorm in 2000 in the hopes that the studio would pick up the project for a feature film. *Id.* ¶¶ 40-46. Lightstorm worked with Ryder to develop the story until the early 2000s. *Id.* With the help of professional screenwriter Stuart Hazeldine, Ryder created multiple drafts of the project, including: (1) a treatment drafted in or around 2000; (2) a screenplay drafted in or around September 2001; and (3) a revised screenplay drafted in or around December 2001, *see* Klaus Decl., Ex. 11 ("KRZ Screenplay"), Docket No. 61-12. *See* FAC ¶ 54. Ultimately, Lightstorm passed on the project in or around 2002. *Id.* ¶ 61.

In 1995, Cameron wrote a "highly detailed script-length treatment in narrative form" for an initial *Avatar* film, known as the "Scriptment." *Id.* ¶ 63; Klaus Decl., Ex. 3 ("Scriptment"), Docket No. 61-4. By 1997, however, Cameron had "decided not to go forward with the project because technology was not sufficiently developed to produce the film in the way he envisioned." *See* FAC ¶ 63. In 2005, Cameron determined that the technology had progressed enough to revisit the project, and he wrote a screenplay for *Avatar 1* based on the Scriptment. *Id.* ¶ 64. *Avatar 1* premiered in 2009 and became the "highest-grossing film of all time." *Id.* ¶¶ 70, 88; Klaus Decl., Ex. 5 ("*Avatar 1*"), Docket No. 61-6.

In 2011, Ryder sued Cameron and Lightstorm in the Los Angeles Superior Court[2], alleging that *Avatar 1* unlawfully appropriated ideas from the *KRZ* materials Ryder had previously shared with Lightstorm. *See* FAC ¶ 71; Klaus Decl., Ex. 1, Docket No. 61-2. Ryder asserted six causes of action in *Ryder I*, including claims for breaches of fiduciary duty and express and implied contract. *See generally Ryder I*. In 2014, the superior court granted summary judgment for Cameron and Lightstorm on all claims. *See Ryder I* ¶¶ 27, 36, Docket No. 61-2. The court held it was "undisputed that *Avatar* and *KRZ* are not substantially similar as a matter of law, and therefore [Ryder could not] raise an inference

[2] *See Ryder v. Lightstorm Entertainment, Inc.*, Los Angeles County Superior Court Case No. BC474876 ("*Ryder I*").

of use" that was necessary to support his claims. *Id.* ¶ 1. The court also found it undisputed that Cameron had "completed and circulated" the Scriptment prior to the creation of *KRZ* or Lightstorm's access to it. *Id.* ¶ 3. As such, the court explained that "for the purpose of determining substantial similarity the Court . . . filter[s] out any alleged similarities between *KRZ* and *Avatar* that appear in the Scriptment." *Id.* Upon Ryder's appeal of the *Ryder I* decision, the California Court of Appeal affirmed the holding that *Avatar* and *KRZ* were not substantially similar as a matter of law. *See Ryder v. Lightstorm Entertainment, Inc*., 246 Cal. App. 4th 1064 (2016) ("*Ryder II*"), Docket No. 61-3.

Meanwhile, in 2013, Cameron purportedly "launched a writers' room to begin writing screenplays for four Avatar sequels." *See* FAC ¶ 77. Cameron drafted between 800 and 1,500 pages of notes – which allegedly "included, reflected, summarized, and/or literally copied" Ryder's *KRZ* materials – to share with his writing team*.* *Id.* Production on the first sequel, *Avatar: The Way of Water* ("*Avatar 2*"), began in 2017, and the movie was released in December 2022. *Id.* ¶¶ 79, 89; Klaus Decl., Ex. 4, Docket No. 61-5. The next sequel, *Avatar: Fire and Ash* ("*Avatar 3*"), premiered in December 2025. *Id.* ¶ 93; Klaus Decl., Ex. 12 ("*Avatar 3*"), Docket No. 61-13. The Court refers to *Avatar 2* and *Avatar 3* collectively as the "Sequels."

Ryder filed this action on December 15, 2025, alleging that Defendants copied from *KRZ* to create *Avatar 2*. *See* Complaint, Docket No. 1. On April 23, 2026, Ryder filed the operative FAC, which amended the Complaint to allege that Defendants additionally copied *KRZ* to make *Avatar 3*. *See generally* FAC. The FAC asserts five causes of action against Defendants: a single claim for copyright infringement (though that single claim encompasses direct, vicarious and contributory theories) and four state law claims. The state law claims are (1) breach of contract, (2) breach of confidence, (3) breach of implied contract, and (4) unfair competition. *Id.* On May 21, 2026, Defendants filed the instant MTD, primarily arguing that all of Ryder's claims should be dismissed because neither of the Sequels is substantially similar to *KRZ*. *See* MTD. Defendants concurrently filed the Anti-SLAPP Motion seeking to strike Ryder's state law claims. *See* Anti-SLAPP Motion.

**A. KRZ**

*KRZ* takes place "in the year 2068, primarily on Europa," which is an ice-clad moon of Jupiter. *See* Klaus Decl., Ex. 6 ("KRZ Proposal"), Docket No. 61-7, at 196; *Ryder II* at

1070. A large, "sinister" corporation called Malloc conducts mining operations on Europa, harvesting organisms called "Kahrs" from ocean vents beneath the moon's icy surface. *See* FAC ¶¶ 104, 109, 145. To mine the Kahrs, Malloc uses humans as well as android robots that are built with human brains and other organic parts. *See generally* KRZ Screenplay. Most of the robots are "KRY" models, which have "limitation chips" that block emotions and free will. *Id.* at 488. Kurtz – the foreman on Europa – however, is a "KRZ" model and has a smaller limitation chip and is self-aware. *Id.* at 491.

Kate Shepherd ("Shepherd"), originally named Kate Marlowe, is a Malloc "adjuster" and assassin whom Malloc sends to Europa to investigate the apparently accidental death of Drew Welles ("Welles"), the commander of its mining base. *Id.* at 480-85, 498. Shepherd travels to Europa with an android named Kary and meets Kurtz, who takes her to the underwater harvesting fields and reveals Europa's thriving aquatic ecosystems. *Id.* at 487-92, 508-19. Kurtz initially tells Shepherd that Welles died in a harvesting accident. *Id.* at 510, 519-20. But as attraction develops between Kurtz and Shepherd, he allows her to experience his memories through a cord connecting neural jacks at the bases of their skulls. *Id.* at 530. Through those memories, Shepherd learns that Welles became obsessed with increasing Kahrs yields and ordered explosives used in the ocean vents, killing KRYs and damaging the vents. *Id.* at 532-38.

To stop Welles, Kurtz has another KRY reprogram his imperative not to hurt humans, kills Welles, and assumes command of the base. *Id.* at 539-44. Shepherd ultimately joins Kurtz and the human miners on the base in fighting Malloc's forces, while Kurtz confronts Kary, who is revealed to be a newer version of the KRZ model that remains loyal to the corporation. *Id.* at 558-84. Although Kurtz ultimately dies, the protagonists prevail, and Shepherd becomes the head of operations on Europa. *Id.* at 583-88.

**B. The Scriptment and Avatar 1**

The Scriptment, which formed the basis for the *Avatar 1* screenplay, is set in the future on Pandora, a moon orbiting a fictional gas giant called Polyphemis. *See* Scriptment at 89, 93, 97-98. Pandora contains floating mountains, vast rain forests, and abundant bioluminescent flora and fauna. *Id.* at 98-100, 133-39. The Na'vi, an indigenous species that lives on Pandora, are large humanoids with blue skin and tails. *Id.* at 91, 95, 113, 132. The Na'vi live in close harmony with their natural surroundings and treat the forest and its

animals as spiritually significant. *Id.* at 112, 123-24, 135, 139-40.

The Resources Development Alliance ("RDA") from Earth has established a human base on Pandora to conduct mining, construction, and scientific operations. *Id.* at 91, 100-05. The RDA mines unobtanium, a rare and extremely valuable superconductor unique to Pandora. *Id.* at 99. Colonel Miles Quaritch ("Quaritch") commands SECFOR, the RDA's private security force. *Id.* at 101, 103. The RDA also oversees the Avatar Program, which creates genetically engineered bodies resembling the Na'vi that human operators control remotely through a mental link and use to interact with the Na'vi. *Id.* at 92, 104-08.

Jake Sully ("Jake"), originally named Josh in the Scriptment, is a paraplegic former Marine who travels to Pandora to become an avatar operator. *Id.* at 89-96, 103; *see generally Avatar 1*. Through his avatar, Jake integrates into Na'vi society and falls in love with Neytiri (originally Zuleika in the Scriptment), who is a Na'vi warrior. *See* Scriptment at 135-55. As conflict escalates over the RDA's exploitation and destruction of Pandora, Jake refuses to return to the human base and joins the Na'vi against the RDA. *Id.* at 155-66. He rallies the nearby Na'vi clans, fights alongside them against the RDA, and prevails. *Id.* at 171, 175-88. Quaritch is killed during the battle. *Id.* at 186-88. Jake then undergoes a Na'vi ritual that permanently transfers his consciousness from his human body into his avatar body. *Id.* at 171-72, 188-89.

**C. Avatar 2**

*Avatar 2* takes place more than 15 years after the events of Avatar. *See generally Avatar 2*. The RDA has returned to colonize Pandora because Earth is dying. *Id.* Jake and Neytiri now have five children under their care, including Quaritch's biological child (named Spider) who was left on Pandora after the RDA's defeat in *Avatar 1*. *Id.* The renewed RDA invasion causes Jake and his family to flee their home and seek refuge with a different Na'vi clan called the Metkayina. *Id*. The Metkayina, who are a lighter, teal shade of blue, live in Pandora's oceanic region and have adapted to an ocean-based life. *Id*. The Sully family has to learn the clan's ways, which include cultural practices that revolve around appreciation for marine creatures – especially the Tulkun, which are sentient, whale-like animals with whom the Metkayina share a spiritual bond. *Id.*

Meanwhile, the RDA has created Recombinants, which are Na'vi avatars implanted

with the memories of deceased human soldiers. *Id*. Quaritch, who died at the end of *Avatar 1*, is brought back to life as a Recombinant to resume hunting Jake and his family. *Id*. The RDA, having apparently moved on from "unobtanium," now funds its operations by hunting and killing Tulkun to extract directly from their brains a valuable substance called "amrita," which stops human aging. *Id*. Captain Mick Scoresby ("Scoresby") leads a Tulkun hunting operation for the RDA with the help of marine biologist Dr. Ian Garvin ("Garvin"). *Id.* The escalating conflict between the RDA and the Na'vi culminates in a series of ocean battles, resulting in significant losses for both sides. *Id*. During the fighting, RDA troops kill Jake and Neytiri's oldest son, Neteyam. *Id.*

**D. Avatar 3**

*Avatar 3* introduces a new, hostile Na'vi clan called the Mangkwan, who conduct raids on other clans. *See generally Avatar 3*. The Sully family are forced to fight off the Mangkwan while still grieving Neteyam's loss. *Id.* At the same time, the RDA continues to threaten the family and Pandora. *Id*. In addition to taking down Jake, the RDA becomes focused on capturing Quaritch's biological son, Spider, after it learns that he – unlike other humans – gained the ability to breathe the air on Pandora. *Id*. The RDA wants to reverse engineer his breathing ability so that humans may more easily colonize Pandora. *Id.* To capture Jake and Spider, Quaritch forms a strategic partnership with the Mangkwan. *Id.* The Tulkun, who continue to be hunted by the humans, join forces with the Na'vi against the RDA. *Id.* Eventually the action culminates in a large confrontation between the Na'vi clans, the Tulkun, and the RDA. *Id.* As the battle dwindles and the RDA are on the verge of defeat, Quaritch and Jake duel each other. *Id.* In the end, the protagonists prevail – at least until the next sequel – and the RDA is repelled, Scoresby is drowned by a Tulkun, and Quaritch flees off the side of a cliff. *Id.*

**II. <u>Motion to Dismiss</u>**

Defendants seek to dismiss Ryder's FAC in its entirety. *See generally* MTD. Defendants argue that Ryder's copyright claim fails because the works at issue are not substantially similar. *Id.* at 3. Defendants further contend that Ryder's state law claims fail for the same reason, or alternatively, for various reasons set forth in Defendants' Anti-SLAPP Motion. *Id.* at 31.

**A. Legal Standard**

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A complaint may be dismissed under Rule 12(b)(6) for one of two reasons: (1) it lacks a cognizable legal theory; or (2) it alleges insufficient facts to support a cognizable legal theory. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008) ("Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory.").

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). The court must construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded allegations of material facts as true, and draw all reasonable inferences from well-pled factual allegations. *Gompper v. VISX, Inc.*, 298 F.3d 893, 896 (9th Cir. 2002). The court is not required, however, to accept as true legal conclusions couched as factual allegations. *See Iqbal*, 556 U.S. at 678. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In deciding a Rule 12(b)(6) motion, a court "may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007).

**B. Request for Judicial Notice**

Before turning to the substance of Defendants' motions, the Court must address Defendants' concurrently filed request for judicial notice. *See generally* Request for Judicial Notice ("RJN"), Docket No. 61. Defendants ask the Court to judicially notice twelve exhibits, including the works at issue in this dispute and state court decisions adjudicating Ryder's earlier action concerning *Avatar 1*. *Id.*

"Generally, district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure," subject to two exceptions: "the incorporation-by-reference doctrine, and

judicial notice under Federal Rule of Evidence 201." *Khoja v. Orexigen Therapeutics, Inc*., 899 F.3d 988, 998 (9th Cir. 2018). Under the incorporation-by-reference doctrine, "[a] court may consider evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006). The Court may take judicial notice of matters of public record and facts not subject to reasonable dispute. *See* Fed. R. Evid. 201(b)(2); *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

The Court finds that *Ryder I* (Ex. 1) and *Ryder II* (Ex. 2), which are the Los Angeles Superior Court and Court of Appeal decisions in the prior state court action, are matters of public record and are properly subject to judicial notice. *See Manufactured Home Cmtys. Inc. v. City of San Jose*, 420 F.3d 1022, 1037 (9th Cir. 2005). Further, the Court finds that Cameron's Scriptment (Ex. 3), *Avatar 1* (Ex. 5), *Avatar 2* (Ex. 4), *Avatar 3* (Ex. 12), and Ryder's *KRZ* materials (Exs. 6-11) are incorporated by reference into the FAC and may properly be considered. Ryder refers to the works in the FAC, they are central to Ryder's copyright claims, and there is no dispute as to the authenticity of the copies provided. Accordingly, the Court **GRANTS** Defendants' RJN.

**C. Copyright Infringement Claims**

Ryder's first cause of action ("Count 1") alleges copyright infringement, bundling together theories of direct, contributory, and vicarious infringement. Defendants argue that the Court should dismiss Count 1 because Ryder has not plausibly alleged that either *Avatar 2* or *Avatar 3* is substantially similar to any of Ryder's *KRZ* drafts. Ryder counters by arguing that the works contain sufficient similarities as to protectable elements of *KRZ*, including its plot and sequence of events, characters and dialogue, setting, and themes. Further, Ryder contends that even assuming the films' end-products do not infringe, Defendants' MTD has not addressed his separately alleged theory that Defendants infringed by producing an intermediate reproduction of *KRZ* in writers' room notes made in preparation for the *Avatar* sequels. *See* MTD Opp. at 11.

1. <u>Copyright Infringement Framework</u>

To state a claim for copyright infringement, Ryder must show "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."

*Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d 620, 624 (9th Cir. 2010). The second prong – that Defendants copied any of the *KRZ* works – has "two distinct components: 'copying' and 'unlawful appropriation.'" *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1117 (9th Cir. 2018), *overruled in part by Skidmore v. Led Zeppelin*, 952 F.3d 1051 (9th Cir. 2020). Factual copying may be established through direct evidence or circumstantially by alleging access to the work and similarities probative of copying. *Id.* To establish unlawful appropriation, a plaintiff must demonstrate that the allegedly infringing work and the copyrighted expression "share *substantial* similarities." *Skidmore*, 952 F.3d at 1064 (emphasis in original).

The Ninth Circuit uses a two-part test to assess substantial similarity. *Hanagami v. Epic Games, Inc.*, 85 F.4th 931, 941 (9th Cir. 2023). "The first part, known as the 'extrinsic test,' 'assesses the objective similarities of the two works, focusing only on the protectable elements of the plaintiff's expression.'" *Id.* (quoting *Rentmeester*, 883 F.3d at 1118). "The second part, referred to as the 'intrinsic test,' 'tests for similarity of expression from the standpoint of the ordinary reasonable observer, with no expert assistance.'" *Id.* (quoting *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 637 (9th Cir. 2008)). "District courts apply only the extrinsic test at the pleadings stage, 'as the intrinsic test is reserved exclusively for the trier of fact.'" *Id.* (quoting *Williams v. Gaye*, 895 F.3d 1106, 1119 (9th Cir. 2018)).

"[W]hen applying the extrinsic test, a court must filter out and disregard the non-protectable elements." *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002). There is no copyright protection for "any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. § 102(b). "Thus, a defendant incurs no liability if he copies only the 'ideas' or 'concepts' used in the plaintiff's work." *Rentmeester*, 883 F.3d at 1117. For literary works, "[t]he test focuses on articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events in two works." *Id.* (quoting *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994)). To show unlawful appropriation, plaintiffs must therefore demonstrate that these elements share "substantial similarity in protectable expression," not merely in facts, ideas, or concepts. *Skidmore*, 952 F.3d at 1064.

Finally, "even if none of the artistic elements in those categories reveals substantial

similarity, works can be substantially similar if they share the 'selection and arrangement' of those elements – or, in other words, 'the *particular* way in which the artistic elements form a coherent pattern, synthesis, or design.'" *Yonay v. Paramount Pictures Corp.*, 163 F.4th 685, 693 (9th Cir. 2026) (quoting *Skidmore*, 952 F.3d at 1074) (emphasis in original); *see also Hanagami*, 85 F.4th at 943. "For a 'selection-and-arrangement' claim to succeed, the elements themselves need not be protectable." *Yonay*, 163 F.4th at 693. Rather, "a copyright plaintiff may argue infringement . . . based on original selection and arrangement of unprotected elements." *Skidmore*, 952 F.3d at 1074 (citation modified). As such, the selection and arrangement itself may become a substantially similar protected element.

A court may dismiss a copyright infringement claim on a Rule 12(b)(6) motion to dismiss if there is no substantial similarity as a matter of law after application of the extrinsic test. While "dismissal of copyright infringement claims occurs more commonly at the summary judgment stage, . . . dismissal at the pleading stage is by no means unprecedented." *Rentmeester*, 883 F.3d at 1123 (citing *Peters v. West*, 692 F.3d 629, 631 (7th Cir. 2012)).[3] Dismissal is appropriate where the works at issue are properly before a court and nothing disclosed during discovery could alter the fact that the similarities between the two works are only in uncopyrightable material or are de minimis. *Id.*; *see also* 3 William F. Patry, Patry on Copyright § 9:86.50 (2020).

2. Intermediate Copying

Ryder first argues that his copyright infringement claim independently rests on a theory of intermediate copying or "literal copying," and because Defendants did not address this theory in their MTD, the claim must survive dismissal. *See* MTD Opp. at 11. The Court disagrees and concludes that Ryder's FAC does not allege a literal copying theory.

"[I]ntermediate copying of [a work] may infringe the exclusive rights granted to the copyright owner in [S]ection 106 of the Copyright Act regardless of whether the end

---

[3] *See also Silas v. HBO, Inc.*, 201 F. Supp. 3d 1158, 1164 (C.D. Cal. 2016) (dismissal by this Court at the pleading stage on substantial similarity grounds); *Esplanade Prods., Inc. v. Walt Disney Co.*, 768 F. App'x 732 (9th Cir. 2019) (affirming Rule 12(b)(6) dismissal on substantial similarity grounds); *Heusey v. Emmerich*, 692 F. App'x 928 (9th Cir. 2017) (same); *Shame on You Prods., Inc. v. Elizabeth Banks*, 690 F. App'x 519 (9th Cir. 2017) (same); *Wild v. NBC Universal*, 513 F. App'x 640 (9th Cir. 2013) (same); *Thomas v. The Walt Disney Co.*, 337 F. App'x 694 (9th Cir. 2009) (same).

product of the copying also infringes those rights." *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1518 (9th Cir. 1992), *as amended* (Jan. 6, 1993) (citing *Walker v. University Books*, 602 F.2d 859, 864 (9th Cir. 1979)). Where a "lawsuit allege[s] infringement only as to the final work of the defendants," however, intermediate copying is not at issue. *Id.* (collecting such cases involving "books, scripts, or literary characters" that rejected intermediate copying arguments); *see also Cline v. Reetz-Laiolo*, 329 F. Supp. 3d 1000, 1036 (N.D. Cal. 2018) (rejecting literal copying theory because plaintiff's complaint was directed to the defendant's final work, rather than any intermediate "improper download of [plaintiff's] manuscript").

Ryder relies entirely on this Court's decisions in *Alcon Ent., LLC v. Tesla, Inc.*, No. 24-cv-09033-GW-(RAOx), to assert that where a plaintiff alleges literal copying in an intermediate stage of creating an infringing work, no substantial similarity is required to find copyright infringement plausibly alleged. *See* MTD Opp. at 13. *Alcon* involved alleged infringement of the movie *Blade Runner 2049* in a Tesla promotion for its Cybercab vehicle. The plaintiff alleged that Tesla wanted to use imagery from the movie to advertise the Cybercab, and that a Tesla employee generated a marketing presentation by feeding *Blade Runner* images into AI. *See Alcon*, 2026 WL 712574 (C.D. Cal. Feb. 3, 2026). The plaintiff expressly pleaded two distinct theories of liability: an "end-product" theory of infringement arising from the image the AI system produced; and a "literal copying" theory arising from feeding the copyrighted work itself into the AI image-generator. *See Alcon*, 2026 WL 712574, at *2-3. The Court held that the plaintiff sufficiently alleged a separate literal copying claim, which did not require substantial similarity between the end-product and the copyrighted work. In doing so, however, the Court clarified that "the manner of copying does not matter *when a plaintiff alleges only infringement by an end-product*." *Id.* at *3. Thus, when a complaint does not "clearly enunciate" a literal copying theory, but instead is directed to the defendant's end product, the substantial-similarity standard applies. *Id.*

Here, the Court agrees with Defendants that Ryder's FAC does not clearly enunciate a literal copying theory. Ryder contends that "literal copying" occurred when Cameron incorporated *KRZ* materials into notes that he shared with his writing team for the Sequels. *See* MTD Opp. at 14. Ryder's FAC, however, identifies the theatrical releases

of *Avatar 2* and *Avatar 3* – not the creation of the writers' room notes – as the "separate and independently actionable act[s] of copyright infringement." *See* FAC ¶¶ 169-70. The allegations regarding Cameron's notes appear to explain the extent of Defendants' access to the *KRZ* materials, rather than a separate theory of infringement. *See id.* ¶¶ 77-78. Although the Court previously afforded Ryder an opportunity to cure this deficiency by amending to allege a claim of copyright infringement based on improper use of *KRZ* to create notes for the Sequels, Ryder has elected to stand on the FAC instead.

3. <u>End-Product Infringement</u>

Because Ryder has not sufficiently alleged a "literal copying" theory, for his copyright claim to survive he must allege (1) that Defendants had access to the *KRZ* materials, and (2) that the Sequels are substantially similar to *KRZ*'s protected elements, giving rise to an inference of unlawful appropriation. *See Cavalier*, 297 F.3d at 822. For the purposes of Defendants' MTD, the Court assumes that Defendants had sufficient access to Ryder's *KRZ* drafts to plausibly give rise to an inference of factual copying. The Court proceeds to apply the extrinsic test to determine if the works are substantially similar.

Here, the *Avatar* Sequels and *KRZ* share certain general features, but are not substantially similar so as to give rise to a plausible inference of unlawful appropriation. Although determinations of substantial similarity are more often made at the summary judgment stage, *see Rentmeester*, 883 F.3d at 1123, this case is unusual in that substantial similarity has already been adjudicated and found lacking between *KRZ* and *Avatar 1*, a conclusion largely building off the fact that the Scriptment was created *before KRZ.* Ryder now alleges that *KRZ* shares a host of similarities with the *Avatar* Sequels, but most of the similarities they share again derive from the Scriptment or *Avatar 1*. And neither expert analysis nor further factual discovery is needed for the Court to determine that the similarities that remain consist of unprotectable ideas or are expressed in materially different ways. Accordingly, and for the reasons discussed below, the Court **GRANTS** Defendants' Motion to Dismiss as to Ryder's copyright infringement claim.

*a. Scope of the Comparison*

As explained above, "when applying the extrinsic test, a court must filter out and disregard the non-protectable elements." *Cavalier*, 297 F.3d at 822. In addition to the Court's filtering of unprotected elements in the works, the Court also excludes elements of

the Sequels that were merely carried forward from either the Scriptment, which predated Defendants' access to *KRZ*, or *Avatar 1*, which was previously found not substantially similar to *KRZ* as a matter of law. *See Ryder I* at ¶ 1.

First, there can be no copyright infringement where the allegedly infringing material predates the allegedly infringed work. *See Murray Hill Publ'ns, Inc. v. Twentieth Century Fox Film Corp.*, 361 F.3d 312, 326 (6th Cir. 2004) ("[W]here [a] defendant owns a prior work containing the same elements, he has no reason, beyond the illicit thrill of copyright infringement, to copy wrongfully from another what he could legally copy from himself."). As such, courts filter out independently created elements in assessing substantial similarity. *See, e.g.*, *Benjamin v. Walt Disney Co.*, No. 2:05-cv-02280-GPS-(MCx), 2007 WL 1655783, at *4 (C.D. Cal. June 5, 2007) (filtering out material from a treatment created before the plaintiffs began working with the defendants); *Green v. Schwarzenegger*, No. 2:93-cv-05893-WMB-(Sx), 1995 WL 874191, at *23 (C.D. Cal. July 12, 1995) (filtering out elements "present in [James] Cameron's earlier motion pictures"). Cameron wrote the Scriptment in 1995, five years before Ryder pitched *KRZ* to Lightstorm; therefore, the Court "'filter[s] out' [the Scriptment's] preexisting elements in assessing the similarity of the works." *See Ryder II* at 1074.

Second, because the court in *Ryder II* held that *Avatar 1* and *KRZ* are not substantially similar as a matter of law, Defendants do not infringe *KRZ* by reusing or carrying forward elements from *Avatar 1* to the Sequels. In *Ryder II*, the court applied a standard that "parallels the inquiry" in copyright cases to examine whether *KRZ* and *Avatar 1* were substantially similar and concluded that they were not. *See Ryder II* at 1074. The Court therefore finds that the issue of substantial similarity between the two works is precluded here. *See Samara v. Matar*, 5 Cal. 5th 322, 327 (2018). *Ryder II* thus forecloses Ryder from relitigating the relationship between *KRZ* and the expression already embodied in *Avatar 1* merely because Defendants continued or developed that expression in later installments. The Court therefore limits its analysis of substantial similarity to only genuinely new elements introduced in the Sequels and proceeds to apply the extrinsic test to determine whether Ryder has pointed to any such substantially similar new elements in the Sequels.

*b. Individual Expressive Elements*

The most salient "new" element in the Sequels, which Ryder alleges is shared by *KRZ*, is the underwater harvesting of organic material that has the power to extend human life. *See* FAC ¶ 97. The Court first addresses why this element, as it appears in the works, is either not protectable or not substantially similar in its protectable components, and then turns to the remaining plot elements, which are largely found in the Scriptment or *Avatar 1*, or are otherwise not actually similar. The Court then addresses whether any other elements of the works besides their plots – *i.e.*, their characters, dialogue, setting, mood, and themes – are substantially similar.

i. Plot

"Basic plot ideas . . . are not protected by copyright law." *Cavalier*, 297 F.3d at 824. When analyzing whether two plots are substantially similar, courts are required to look "beyond the vague, abstracted idea of a general plot" and instead focus on "the objective details of the works." *See Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985) (citing *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984)).

In *Berkic*, the Ninth Circuit held that no reasonable jury could find that two screenplays were substantially similar because, although "at a very high level of generality" the works had similarities, including that "both deal[t] with criminal organizations that murder healthy young people, then remove and sell their vital organs to wealthy people in need of organ transplants" and derived "their general story from the adventures of a young professional who courageously investigates, and finally exposes, the criminal organization," these ideas were only the basic plots of the two works. *Id.* The court explained that this level of abstraction did not establish substantial similarity because "the actual concrete elements that [made] up the total sequence of events and the relationships between the major characters" were not similar. *Id.*

a. Harvesting of Life-Extending Substance

Although Ryder alleges many similarities across the works, he centers his claim on "[one] major story element" – the "harvesting of an animal-based substance that when refined can extend human life." *See* FAC ¶ 97. The Sequels introduce "amrita," an extremely valuable liquid, which is said to stop human aging and is found in the cranial cavities of whale-like, sentient creatures known as Tulkun. *See Avatar 2* at 2:00:59-

2:02:47. The RDA exploits amrita to generate revenue for its broader activities on Pandora, including its colonization effort. Ryder alleges that amrita is substantially similar to "Kahrs" in KRZ. *See* FAC ¶¶ 109, 116. "Kahrs" refers both to a plankton-like organism found in hydrothermal vents beneath Europa's ocean floor and to the life-extending substance obtained from it. *Id.*

In analyzing this similarity, the Court first filters out the overarching premise of corporate extraction of a valuable resource from an alien moon. *See, e.g.*, FAC ¶¶ 103-05, 128, 153. That premise was already embodied in the Scriptment and therefore cannot support an inference that Defendants copied it from *KRZ*. As Defendants explain, both the Scriptment and the finished *Avatar 1* feature "an evil corporation (the RDA) . . . extracting a valuable resource, on the moon of a gas giant planet using human labor. The RDA is obsessed with increasing output, and the RDA's actions threaten to cause Pandora's ecosystem to unravel." *See* MTD at 20; Scriptment at 99, 109, 126, 159; *Avatar 1* at 1:25:30-1:26:50, 1:39:41-1:41:10. In the Sequels, the same corporation remains on Pandora and continues the same broader project of exploiting its natural resources amid conflict with those seeking to protect Pandora's environment.

The Court's analysis of the Sequels' resource-extraction premise is therefore limited to the new features Ryder identifies: the addition of a life-extending natural resource and the mechanism through which that resource is obtained. As an initial matter, though, the Court concludes that it may also filter out the general idea of a naturally occurring substance that arrests aging or extends human life from the substantial similarity analysis. A rare, naturally derived substance that extends life is a well-known trope across literature and film. *See* MTD at 14 (citing examples including the elixir of life in the *Harry Potter* series, the immortality potion in *Death Becomes Her*, the water from the Holy Grail in *Indiana Jones and the Last Crusade*, and the life-extending "spice" in *Dune*). Ryder, however, additionally identifies twelve allegedly shared features of the substances beyond their life-extending properties. *See* MTD Opp. at 18-19; FAC ¶¶ 109-11, 114. The allegedly similar features comprise: (1) the substances' source, (2) the mechanism of harvesting from that source, (3) their appearance, and (4) their function in the overall plot. *Id.* The Court has examined each of the alleged similarities and finds that none render the substances substantially similar in their objective details.

First, the biological sources of Kahrs and amrita and the substances' relationships to those sources are materially different. *KRZ* depicts Kahrs as microscopic or plankton-like biological material found in hydrothermal vents at the bottom of the ocean, collected through an industrial extraction process. *See* KRZ Proposal at 231. Amrita, on the other hand, is a discrete liquid removed from the cranial cavity of a sentient Tulkun after the animal is actively pursued and killed in a whaling-type operation. *See Avatar 2* at 1:54:30-2:03:11. The films also emphasize that only a small quantity of amrita is taken from each massive Tulkun, whereas entire batches of the Kahrs organism are collected and processed. *Id.* at 2:02:58-2:03:04; KRZ Proposal at 231. Thus, although Ryder emphasizes that Kahrs and amrita are both "animal-based," *see* FAC ¶ 104, the works express that relationship differently.

Second, the harvesting operations themselves are materially different. Ryder alleges that both Kahrs and Tulkun are "hunted with explosive underwater charges in conjunction with mini-submersibles and tentacled/crab-like machines that 'walk' underwater," and that "harvesting is scheduled around lunar cycles." FAC ¶¶ 117, 160. That description identifies some common ingredients but obscures stark differences in objective expression. Kahrs is not hunted at all. *KRZ* depicts passive biological material being collected from hydrothermal vents, whereas the Sequels depict an active hunt for sentient animals. Further, the underwater walking machines are completely different. In *KRZ*, robot-piloted "Walking Dredges," described as bottom crawlers with four octopus-like tentacles, suction organic material from the sea floor. *See* KRZ Proposal at 231. The Sequels' human-piloted, multi-limbed Crab Suits, by contrast, do not have tentacles or suction capabilities; they are deployed both during harvesting and underwater combat; and they are never depicted walking on the ocean floor. *See generally Avatar 2*; *Avatar 3*. Next, although both works connect harvesting activity to an astronomical event, they are similar in this regard only at an abstract level. *KRZ* uses a near-daily recurring gravitational cycle as a physical prerequisite to Kahrs extraction; the Sequels use an annual eclipse event to increase the number of Tulkun available to hunters (but Tulkun are still hunted at other times). *See FAC* ¶ 117; *Avatar 3* at 1:55:00. Finally, mini-submarines and underwater explosives are scenes-a-faire in science fiction stories set underwater. In sum, while both harvesting operations occur in aquatic extraterrestrial environments, that general similarity

does not establish substantial similarity.

Third, while the substances' visual presentation supplies a limited similarity, it does not establish substantial similarity in protectable expression. The FAC alleges that *KRZ* at one point portrays Kahrs as having a "translucent . . . warm . . . yellow glow" and being stored in "slim . . . glass vials," while the Sequels depict amrita as a luminous yellow liquid similarly collected into a small vial.[4] FAC ¶ 114. The use of a small container to hold and transport a small quantity of valuable liquid is functional and entitled to little weight in the substantial-similarity analysis. Further, the similarity in color is at most de minimis, considering the overall differences between amrita and Kahrs. The two works may share the presentation of a luminous liquid in a vial, but that resemblance does not overcome the material differences in biological sources and extraction processes previously discussed. Moreover, the Court notes that the appearance and source of amrita resemble that of spermaceti, the "substance found in head cavities of sperm whales that whalers once highly prized." *See* MTD at 15 n.11. Expression that has obvious inspiration from the natural world is not protectable. *See Satava v. Lowry*, 323 F.3d 805, 812-13 (9th Cir. 2003) (holding that artistic choices "governed by jellyfish physiology . . . are the common heritage of humankind, and no artist may use copyright law to prevent others from depicting them").

Lastly, amrita and Kahrs also play different roles in the overall plot. Ryder alleges that "[a]t the beginning of both *Avatar 2* and *KRZ*," and continuing to "drive the plot" in *Avatar 3*, "production of the highly prized resource has been interrupted." *See* FAC ¶ 106. The ensuing story then purportedly "centers on a main character being charged with finding the person responsible for interfering with [the harvesting] and, if necessary, killing that person to permanently end the threat." *Id.* ¶ 107. This comparison rests on a mischaracterization of the setup of the Sequels. Rather than an unexplained mining interruption, the Sequels are premised on an existing war between the Na'vi and the humans, centered around colonization of Pandora. Indeed, amrita is not even mentioned

[4] The Court assumes this description without resolving Defendants' contention that the quoted description is not found in the submitted *KRZ* materials. The Court, however, notes that other identified *KRZ* versions depict Kahrs differently. The other versions' descriptions include: a "luminous purple solution," a "purple liquid," an "opaque purple liquid," a "phosphorescent green haze," and "luminescent green." *See* MTD at 15.

until more than two hours into the first sequel. *See Avatar 2* at 2:02:17. Instead, the RDA military commander sums up the Sequels' premise by saying, "We're not here to run a mine. . . . Our task here is to . . . make Pandora the new home for humanity. But before we can do that, we need to pacify the hostiles." *Id.* at 23:58-24:26.

Accordingly, because the source of Kahrs and amrita, the mechanism of harvesting from that source, their appearance, and their function in the overall plot are all materially different, the Court concludes that the Kahrs and amrita plot elements are not substantially similar in protectable expression.

b. Other Plot Elements

The Court has also examined each of Ryder's other alleged plot similarities and concludes that none rise to the level of substantial similarity. Again, this analysis is made relatively straightforward given the significant overlap between plot elements in the Scriptment or *Avatar 1* and the Sequels, which are themselves "largely a retread" of each other. *See* FAC ¶ 78. As discussed above, the Scriptment predated *KRZ*, and *Avatar 1* has already been deemed not substantially similar to *KRZ*. With that in mind, the Court proceeds to discuss six allegedly similar plot sequences. To the extent an alleged plot similarity is not discussed here, the Court has considered the similarity and deemed it either not actually similar or only similar in unprotectable expression.

First, the Court discusses Ryder's allegation that both works involve technology for transferring a person's memories or consciousness into another being. *See* FAC ¶ 122. The general premise of a human consciousness inhabiting an avatar body was already embodied in the Scriptment and *Avatar 1*. Avatars are temporarily endowed with human consciousnesses throughout the story, and Jake's consciousness is ultimately transferred permanently into his avatar body. *See* Scriptment at 92, 189; *Avatar 1* at 15:00-18:32, 2:33:34-2:35:20. The Sequels merely add a slight variation on that technology: stored memories and personality data belonging to the deceased Quaritch are implanted in a Recombinant body, which then experiences itself as Quaritch. *See Avatar 2* at 9:05-12:26. This added variation is not enough to avoid filtering the element as Cameron's prior work. *See Murray Hill*, 361 F.3d at 325-26. Regardless, *KRZ*'s "5senses" technology still performs a different function. It permits Shepherd to access and experience another individual's recorded sensory memories, but it does not permanently endow a new body

with the transferor's identity, personality, or consciousness. *See* FAC ¶ 122. Thus, the works share only the general science-fiction idea that memory or consciousness may be transferred and do not express that idea through substantially similar mechanisms.

Second, Ryder alleges that in both works, a quota-driven leader adopts an extreme production plan, an environmentally concerned subordinate objects, the leader proceeds, and his obsession ultimately causes his demise. *See* FAC ¶¶ 137-43. But, again, the core of that character arc was already embodied in Quaritch's arc in the Scriptment. There, Quaritch oversees security for the RDA's resource-extraction operation, escalates the conflict by leading a destructive assault on the Na'vi's home, which is rich in resource deposits, and is killed in the resulting resistance. *See* Scriptment at 99, 103, 175-76, 187-88. The general progression of an RDA leader employing increasingly destructive measures to advance the corporation's extraction project and ultimately being destroyed by the resulting resistance therefore cannot support an inference that Defendants copied that arc from *KRZ*.

Third, Ryder alleges that *KRZ* and the Sequels feature a corporation-aligned character who is exposed to the beauty of an alien environment, begins to change allegiance, and ultimately resists the corporation. *See* FAC ¶¶ 134-36. This sequence is largely not depicted in the Sequels. Although Quaritch develops relationships on Pandora and ultimately abandons his immediate fight with Jake to save Spider, he does not join the Na'vi or turn against the RDA. *See Avatar 3* at 1:20:50-1:29:51, 2:27:45-2:59:01. When Jake urges him to see Pandora differently, Quaritch responds that he still remembers "what team [he is] playing for," and *Avatar 3* ends with Quaritch rejecting Jake's invitation to unite. *See Avatar 3* at 57:19-58:00, 2:27:45-2:59:01. Ryder's prediction that Quaritch will complete such an arc in future *Avatar* installments is not expression contained in the Sequels. Moreover, at the general level of a corporate agent whose exposure to an alien culture changes his loyalty, the arc was already embodied in Jake's story in the Scriptment and *Avatar 1*. *See generally* Scriptment; *Avatar 1*. The Sequels therefore do not add a new sequence substantially similar to Shepherd's decision to oppose Malloc.

Fourth, Ryder alleges that in both works, an antagonist "makes an offer to the local natives and attempts to enlist them in an effort to eliminate the protagonist." *See* FAC ¶¶ 125-27. It is a stretch to refer to both intermediary populations as "local natives." *See id.*

In *KRZ*, Kary asks the *human miners* on the Malloc base, who have colonized Europa, to turn over Kurtz and Shepherd. *See* FAC ¶ 125. In *Avatar 3*, Quaritch threatens the Metkayina clan, not any human workers, to surrender Jake. *See Avatar 3* at 1:38:07-1:43:50. The respective offers are also materially different. Kary offers that the workers may complete their jobs, receive their compensation, and return home if they comply. *See* FAC ¶ 125. In *Avatar 3*, Quaritch terrorizes and begins burning down the Metkayina village, offering only to avoid further destruction in return for Jake. *See Avatar 3* at 1:38:07-1:43:50. Thus, the only similarities between the plot sequences are general: an antagonist threatens a group harboring the protagonist. This abstract similarity does not establish substantial similarity. *See Berkic*, 761 F.2d at 1293.

Fifth, Ryder alleges that the works substantially share an underwater action sequence involving a mini-submarine. Ryder characterizes the two scenes as a "markedly similar remote-control minisub battle sequence." *See* FAC ¶ 154. In *KRZ*, Kurtz remotely takes control of a damaged mini-submarine from its robotic pilot after a Kahrs mining accident and steers the vehicle into a compressed-air tank. In *Avatar 2*, a Na'vi character fleeing RDA soldiers forms a neural connection with a giant sea creature and uses that animal to attack the soldiers' pursuing mini-submarine. *See Avatar 2* at 2:24:04-2:24:40. Ryder emphasizes that in both scenes a character remotely redirects an opponent's underwater vehicle into a collision that damages the cockpit amid an explosion of bubbles. But stated at that level of abstraction, any destruction of a submarine would be similar to the *KRZ* sequence. The cause of each collision is completely different, and the characters and dramatic importance are not parallel. The scenes therefore share only the general occurrence of an underwater action sequence in which a submersible is destroyed, not substantially similar protectable expression.

Sixth, Ryder compares the conflict between Kurtz and Kary with the conflict between Jake and Quaritch. The FAC alleges that each work places sympathetic and antagonistic anthropomorphic beings on opposing sides of a conflict that culminates in a confrontation in which the antagonist seeks to prove that he or it is the superior version of the relevant model. *See* FAC ¶¶ 119-24, 133. This is largely not depicted in the Sequels, and to the extent it is, the similarity is generic. In *KRZ*, Kurtz and Kary are related android products: Kurtz is the original self-aware android who rebels against Malloc to protect

Europa, while Kary is a newer and allegedly more advanced version created by Malloc, who remains loyal to the corporation. Kary directly challenges Kurtz to establish which version is superior. *See* FAC ¶ 123. Jake and Quaritch, on the other hand, are not merely competing avatar versions. Their rivalry is carried forward from the personal conflict established in *Avatar 1*, which culminated in the death of Quaritch's human form. *See* Scriptment at 187-88; *Avatar 1* at 2:27:16-2:30:39. Quaritch's desire to defeat Jake with his new body is therefore not equivalent to Kary's model-based rivalry with Kurtz. This alleged plot similarity therefore boils down to only the generic circumstance of two anthropomorphic adversaries confronting one another.[5]

ii. Characters and Dialogue

The Court focuses on two sets of alleged character similarities: Welles and Scoresby; and Dr. Jeffrey Deavor ("Deavor") and Dr. Ian Garvin ("Garvin"). Other purported similarities are alleged as "character arcs" in the FAC and are analyzed above as plot sequences. *See* FAC ¶ 137.

When analyzing whether two characters are substantially similar, courts require a very high degree of similarity between them. *See Shaw v. Lindheim*, 919 F.2d 1353, 1358 (9th Cir. 1990). As such, courts do not find characters to be substantially similar when the two characters have noticeable differences. *See Benay*, 607 F.3d at 626-27 (finding that differences between two characters' traits including marital status, job, and ideology prevented a finding of substantial similarity).

First, the Court compares Welles with Scoresby. Both men supervise resource-extraction activity, speak about production quotas, disregard concerns about environmental harm, and eventually die in connection with the operations they insist on continuing. *See* FAC ¶¶ 137-41. This characterization, however, overlooks key differences, such as the

---

[5] The Court briefly adds that Ryder compares the romance between Shepherd and Kurtz with the developing relationship between Spider and a Na'vi girl named Kiri. *See* FAC ¶ 129. The Scriptment already made a human/Na'vi romance central to the story: Jake, a human, falls in love with Neytiri while inhabiting a genetically engineered Na'vi-like avatar body. *See* Scriptment at 153-54, 168, 189. Ryder's distinction that Spider remains in his human body in the Sequels gives undue weight to the physical form of the human character in the inter-species relationship. The Scriptment treats Jake's human and avatar bodies as embodiments of the same person for purposes of that relationship – Neytiri even kisses Jake in his human form during the final transfer ritual, and the avatar is itself an artificially created "non-Na'vi" body. *See Avatar 1* at 2:33:34-2:35:20. The Spider/Kiri relationship therefore represents a variation on the established *Avatar 1* premise, not new expression substantially similar to Shepherd and Kurtz's romance.

characters' respective jobs and deaths. *See Benay*, 607 F.3d at 626-27. Welles commands the entire Europa mining base, and is already dead when *KRZ*'s principal narrative begins, having been killed by his subordinate Kurtz. *See* KRZ Proposal at 224-25, 234; KRZ Screenplay at 540-42. Scoresby, on the other hand, has authority far below commanding the RDA's overall presence on Pandora. *See Avatar 2* at 1:39:57-2:03:11. He is the captain of a Tulkun-hunting operation and is ultimately killed by a Tulkun during the hunt rather than by a subordinate engaged in an internal rebellion. *Id.*; *Avatar 3* at 2:52:32-2:53:22. Scoresby also remains an active participant throughout the Sequels. *See generally Avatar 2*; *Avatar 3*. Given these differences, the characters' asserted common traits do not establish substantial similarity in character expression.

Ryder further compares Deavor with Garvin, alleging that both are scientists who become appalled by the destructive extraction of the life-extending substance, oppose the relevant captain, and eventually side with those resisting the corporation. *See* FAC ¶¶ 142-44. Although Deavor appears to sarcastically suggest the destructive plan, there is little suggesting that Deavor opposes the escalation. *See* KRZ Screenplay at 533-34. In the scene Ryder identifies as "fundamentally identical," Kurtz – not Deavor – refuses Welles's order and says, "I didn't sign on for this," whereas Garvin personally objects to Scoresby and speaks the corresponding line in *Avatar 3*. *Id.*; *Avatar 3* at 1:55:00-1:55:54. Moreover, the two characters' jobs are only similar in that they are generally related to science. Garvin is a marine biologist whose expertise concerns Tulkun and who becomes morally disturbed by the RDA's whaling operation. *See Avatar 2* at 1:39:57-2:03:11; *Avatar 3* at 1:55:00-1:55:54. Deavor, on the other hand, is a "med-tech" who repairs injured robots. *See* KRZ Screenplay at 507. Accordingly, the Court concludes that the characters are not substantially similar.[6]

iii. Setting and Mood

---

[6] Ryder also alleges two other similarities in dialogue, which the Court briefly addresses. Ryder alleges that both works use the title "Chairman," and both feature a sardonic remark – made in *KRZ* when Kate enters Kurtz's lounge and in *Avatar 3* when Quaritch enters Varang's hut. *See* FAC ¶¶ 132, 156. First, "Chairman" is an ordinary corporate title, not protectible expression. *See Narell v. Freeman*, 872 F.2d 907, 911 (9th Cir. 1989) (holding that ordinary phrases are not entitled to copyright protection). Second, the sardonic remarks are plainly not similar in expression: Kate says that she "just wanted to see what [Kurtz had] done with the place," whereas Quaritch chuckles and says, "Cozy." *See* FAC ¶ 156. The scenes therefore share only the general idea of a character responding dryly to strange decor, not substantially similar dialogue.

Ryder alleges an overarching similarity in the setting of the two works, as both "are set in a water environment and showcase a vibrant and thriving ocean ecosystem," and contain "marine oriented dramatic gimmicks." *See* FAC ¶¶ 150, 154. Such gimmicks include: (1) "an illuminated 3-D map depicting the beneath-the-surface ecosystem;" (2) mini-submarines; (3) "underwater walking submersibles," and (4) various deep-sea sequences. *Id.* ¶ 154.

"Settings that naturally and necessarily flow from the basic plot premise . . . constitute scenes-a-faire and cannot support a finding of substantial similarity." *See Cavalier*, 297 F.3d at 824 (citation modified); *see also Benay*, 607 F.3d at 627-28 (finding that settings such as "the Imperial Palace, . . . the Imperial Army's training grounds, and battle[fields] [ ] in various places in Japan" were unprotected settings which flowed naturally from the premise of "an American war veteran who travels to Japan to help the Emperor fight a samurai rebellion").

The general idea of an aquatic setting is not protectable, and the more specific setting elements that Ryder identifies are either not actually similar to elements in *KRZ* or are scenes-a-faire flowing from the aquatic setting. First, as previously discussed, Ryder has not sufficiently established that the Sequels' "underwater walking submersibles" or any of the various deep-sea sequences are substantially similar to any element in *KRZ*. *See supra*, Section II.C.3.b.i. Second, the 3D table map is technology that was present in *Avatar 1* and the court in *Ryder II* specifically deemed the map not substantially similar to anything depicted in *KRZ*. *See Ryder II* at 1077. Although the map now shows underwater activity, rather than the places featured in *Avatar 1*, that follows from the overall change of setting in the Sequels; the RDA uses the 3D map technology to track the protagonists, who have now moved to the ocean. Finally, as previously noted, mini-submarines are scenes-a-faire in a science fiction story set underwater.

iv. Themes

"A work's theme is its overarching message." *Silas*, 201 F. Supp. 3d at 1180. The Court identifies the following themes alleged in the FAC to be shared across the works: corporate greed and exploitation, environmental preservation, spiritual interconnectedness, and fear of colonization or unrestricted human expansion. *See generally* FAC. All of these themes are present in the Scriptment and *Avatar 1* and naturally carried over to the Sequels.

*See generally Avatar 1*; *Avatar 2*; *Avatar 3*.

c. *Selection and Arrangement*

Finally, "even if none of the artistic elements in those categories reveals substantial similarity, works can be substantially similar if they share the 'selection and arrangement' of those elements – or, in other words, 'the *particular* way in which the artistic elements form a coherent pattern, synthesis, or design.'" *Yonay v. Paramount Pictures Corp.*, 163 F.4th 685, 696 (9th Cir. 2026) (quoting *Skidmore*, 952 F.3d at 1074) (emphasis in original). "[The] copyright plaintiff must identify 'a combination of elements numerous enough' and with a 'selection and arrangement original enough that their combination constitutes an original work of authorship.' Then, the plaintiff must show that the defendant's selection and arrangement is substantially similar to the plaintiff's." *Id.* Contrary to Ryder's contention, selection and arrangement is part of the extrinsic test, which the Court may perform at the pleadings stage. *See Hanagami*, 85 F.4th at 941.

Here, the Court finds that Ryder has not identified an original, and therefore protectable, selection and arrangement of elements shared in both works. The Court cannot find in the FAC any specific selection and arrangement theory beyond abstract plot structures. For example, Ryder alleges that when the "initial four elements of the setup – (i) an evil corporation, (ii) a monopoly to extract a valuable resource, (iii) production having been disrupted, and (iv) the drive to eliminate the disruptor – are combined with" the similarities between Kahrs and amrita, it creates a protectable selection and arrangement. *See* FAC ¶ 108. A copyright plaintiff, however, "cannot establish substantial similarity by reconstituting the copyrighted work as a combination of unprotectable elements and then claiming that those same elements also appear in the defendant's work, in a different aesthetic context." *See Skidmore*, 952 F.3d at 1075. Ryder has not sufficiently shown in his FAC or in his opposition to the MTD that the arrangements in both works combine to create the same aesthetic context.

Further, Ryder's characterization of the arrangements in both works picks out broad similarities occurring over roughly nine hours of material in the *Avatar* films, which obscures numerous differences between the works. "Upon any work . . . a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. . . . [B]ut there is a point in this series of abstractions where they are no longer

protected, since otherwise the [author] could prevent the use of his 'ideas,' to which, apart from their expression, his property is never extended." *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930). As such, the Court finds that Ryder has not plausibly alleged a selection and arrangement theory of copyright infringement.

*d. Dismissal at the Pleading Stage*

Lastly, the Court addresses Ryder's contention that it should refrain from deciding substantial similarity at the pleadings stage because expert testimony would aid its determination. *See* MTD Opp. at 14-17.

Ryder's prior state court action has significantly narrowed the issues here by finding that *KRZ* and *Avatar 1* are not substantially similar after accounting for the elements already present in the Scriptment. The remaining alleged similarities do not require specialized knowledge to evaluate. Both *KRZ* and the *Avatar* Sequels are intended for general audiences and concern subject matter readily comprehensible without expert assistance. *See Gilbert-Daniels v. Lions Gate Ent. Corp.*, No. 2:23-cv-02147-SVW-(AGRx), 2023 WL 8938403, at *2 (C.D. Cal. Dec. 7, 2023), *aff'd*, 2024 WL 5116299 (9th Cir. Dec. 16, 2024) (explaining that although the extrinsic test may often require the aid of expert testimony, such evidence is "far less critical" in cases "where the works are targeted at a general audience and deal with subject-matter readily understandable by any ordinary person, including the Court"). For example, the Court agrees with Defendants that "[i]t does not take a genre expert to know that tales about searching for a Fountain of Youth date back to ancient times." *See* MTD Reply at 16-17. Likewise, "judicial experience and common sense" are sufficient to determine that the mere use of mini-submarines flows naturally from the premise of an underwater science fiction story. *See Masterson v. Walt Disney Co.*, 821 F. App'x 779, 781-82 (9th Cir. 2020) (affirming dismissal at the pleadings stage and explaining that "the presence of anthropomorphized emotion characters flows from the premise of doing a children's story about human emotions"). In light of the narrowed issues and the foregoing analysis of the remaining alleged similarities, the Court concludes that neither expert testimony nor other discovery would alter its determination that the works are not substantially similar.

4. <u>Contributory and Vicarious Infringement</u>

Count 1 also includes claims for secondary liability for the alleged copyright

infringement discussed above. "It is well-established that '[s]econdary liability for copyright infringement does not exist in the absence of direct infringement.'" *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1031 (9th Cir. 2013) (quoting *A & M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 n.2 (9th Cir. 2001)). Here, the Court has concluded that there is no direct infringement because none of the *KRZ* works are substantially similar to the Sequels. As a result, Ryder's theories of secondary infringement also fail. Accordingly, the Court **GRANTS** Defendants' MTD and dismisses Count 1.

**D. Remaining State Law Claims**

The second through fifth causes of action allege state law claims for (1) breach of contract, (2) breach of confidence, (3) breach of implied contract, and (4) unfair competition. *See* FAC ¶¶ 176-226. All of these causes of action appear to arise from the same alleged unauthorized use of *KRZ* to make the *Avatar* Sequels discussed above. *See id.* Defendants also concurrently filed their Anti-SLAPP Motion seeking to strike the state law claims under California Code of Civil Procedure § 425.16, which permits special motions to strike strategic lawsuits against public participation for conduct relating to certain protected activity.

A district court that has original jurisdiction over a civil action "shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Because the Court has dismissed Ryder's federal copyright claim, the Court declines to exercise supplemental jurisdiction over the state law claims, which are based on the same underlying unlawful appropriation as the copyright claim. *See id.*; *see also* 28 U.S.C. § 1367(c)(3) ("[D]istrict courts may decline to exercise supplemental jurisdiction . . . if . . . (3) the district court has dismissed all claims over which it has original jurisdiction.").

Accordingly, the Court dismisses without prejudice the remaining state law claims. *See Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1000-01 (9th Cir. 1997) (en banc) (holding that district courts may decline to exercise jurisdiction over state law claims when federal claim is dismissed at the pleading stage when weighing judicial economy, convenience, fairness, and comity). Because the Court **GRANTS** dismissal of the state law claims for

lack of supplemental jurisdiction, it also **DENIES as MOOT** Defendants' Anti-SLAPP Motion.

## III. Conclusion

Based on the foregoing reasons, the Court (1) **GRANTS** the MTD; and (2) **DENIES as MOOT** the Anti-SLAPP Motion. As mentioned, the Court previously granted leave to amend to address certain deficiencies identified above. Ryder has elected to stand on the FAC rather than amend. Accordingly, the Court dismisses the FAC without further leave to amend.